**Robert SMITH, a.k.a., Robert Lee Johnson, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71433.

Court of Criminal Appeals of Texas, En Banc.

March 8, 1995.

Stanley G. Schneider and Tom Moran, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Karen A. Clark and Mark Vinson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for State.

## OPINION

MEYERS, Judge.

Appellant was found guilty for the capital murder of James Wilcox in the course of robbery. Tex.Penal Code Ann. § 19.03(a)(2). After the jury affirmatively answered the submitted statutory special issues, the trial court sentenced appellant to death. Tex. Code Crim.Proc.Ann. art. 37.071(b). Appeal to this Court is automatic. Tex.Code Crim. Proc.Ann. art. 37.071(h). We will affirm.

## I. EVIDENTIARY ISSUES

Because several of appellant's complaints on appeal concern the facts of the underlying crime, a recitation of the facts is necessary. Appellant and his accomplice entered the Fayco Menswear clothing store in Houston fifteen minutes before closing. The two new "customers" wandered throughout the store, appellant finally settling upon several high priced goods. Because of his behavior and his failure to try on any of his purchases, the saleslady, Ms. Kim, became suspicious. She signaled a friend at another store that she was in trouble. Ms. Kim also picked up the phone and called the operator for help. Before Ms. Kim could speak to the operator, appellant pointed a gun at her head and told her to hang up the phone and to lay on the ground. She complied. Ms. Kim's friend arrived and was maced by appellant's accomplice when he entered.

Appellant, unable to open the cash register, ordered Ms. Kim to stand and retrieve money from the register. When she stood, Ms. Kim moved appellant's car keys which he had placed with his purchases on the counter. Appellant, unaware his keys had been moved, fled the store with money and merchandise along with his accomplice. When they had

left, Ms. Kim called the police and also informed the local security guards of the robbery.

Appellant fled in the direction of a KMart two buildings away from Fayco Menswear. As appellant approached his car, Mr. Griffith, a KMart security supervisor, was approaching his auto. Appellant asked Mr. Griffith to call an ambulance because a building was on fire, pointing in the general direction of Fayco Menswear. Mr. Griffith saw no fire and thought it strange an ambulance should be called, nevertheless, he began to get into his car. A few moments later, Mr. Griffith heard appellant say, "I can't find the fucking keys. I can't find the fucking keys now." Appellant and his accomplice then exited their car and fled.

Soon after they had fled, Mr. Griffith was informed of the robbery by one of the local security guards. Mr. Griffith and the security guard got in Mr. Griffith's car and pursued the two robbers. Mr. Griffith and the guard saw appellant and his accomplice jump a fence into a nearby abandoned trailer park. They drove to an entrance where a gate had been knocked down. Approximately 12 to 15 seconds elapsed between the time the robbers jumped the fence to the time the pursuers got to the entrance. As they were exiting the car, Mr. Griffith heard a gunshot. Each man ran behind a tree for cover. From behind his tree, Mr. Griffith could hear two frantic voices from inside the park. However, he could only see shadows.

A truck engine started, its lights went on, and the truck began heading in Mr. Griffith's direction. As a warning, Mr. Griffith fired four shots into the air. The truck stopped, and its occupants exited and fled on foot. The police arrived and requested Mr. Griffith and the security guard to return to Kmart to watch the abandoned vehicle. The police then continued the pursuit.

The police brought in a K–9 unit and began tracking the robbers using a Belgian Malinois, a dog similar in appearance to a compact German Shepard. The dog and his handler tracked appellant into a wooded area where the dog was released. The dog caught up with appellant, and his handler arrested appellant as the dog was attempting to pull appellant from some brush.

Another officer approached the abandoned truck. In close proximity to the truck, a tent had partially collapsed. On part of the tent the officer discovered a dead male, subsequently identified as James Wilcox. Appellant later confessed to the murder of Wilcox.[1]

In appellant's first three points of error, he complains the trial court erred in admitting the evidence of appellant's robbery of the men's clothing store during the guilt phase of the trial and in failing to properly limit the jury's consideration of such evidence.[2] Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."

---

1. Appellant confessed in part,

 We ran around the [KMart] building into the woods. We ran into a truck that was parked under a tree. I saw a white man laying down on the ground. The man was on top of a tent. The man jumped up and asked what we were doing. Larry told the man give me your keys and the man said "my front end messed up." Larry hit the man and they started wressling (sic). The man looked over at me and I pulled the gun. I asked him politely to give us the truck. The man grabbed my hand and started to wrestle. The man ran back to the truck where Larry was. As I walked up on the truck telling the man we do not want to hurt you because the police behind us. We just need a ride. By this time the man grabbed my arm again and I got loose. I started backing up and the man started towards his truck that Larry was in. The police pulled up and Larry pulled the truck back up. By this time the man grabbed Larry by the neck. Larry got loose from him. The man grabbed me by the leg and I shot him in the arm. I asked the man four times "is you okay." He stated "yes." I started to run and I throwed (sic) the pistol down on the ground. Larry stopped and picked the pistol up and stated "Let's split the money up." As we split the money up we went our separate ways.

2. Appellant was indicted for the murder of James Wilcox while in the course of committing or attempting to commit the robbery of Wilcox.

Tex.R.Crim.Evid. 404(b); *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex.Crim.App. 1991) (on rehearing). Rule 404(b), however, lists a number of exceptions to this rule. For instance, the evidence may be admissible to prove motive, opportunity, intent, preparation, plan knowledge, identity or absence of mistake or accident. *Montgomery*, 810 S.W.2d at 387; Tex.R.Crim.Evid. 404(b). This list is neither exclusive nor exhaustive. McCormick, Evidence § 190 (4th ed. 1992); Goode, Wellborn & Sharlot, 1 Texas Practice § 404.6.3, at 173 (2nd ed. 1993).

Appellant filed a motion to suppress the evidence of his extraneous offenses with the trial court. The court denied the motion noting that the "State has [the] burden to prove intent and other elements." During the charge conference, the trial court again stated that the evidence was admissible to show appellant's motive and intent. Appellant contends on appeal that the evidence was admitted as background evidence only, and is not admissible unless it is "necessary" to the jury's understanding of the offense at trial. *See Rogers v. State*, 853 S.W.2d 29, 32 (Tex.Crim.App.1993). Appellant argues further that the only issue at trial was whether appellant intentionally killed Wilcox and the evidence at the first aggravated robbery does not have any bearing on that issue.

■ We disagree. The evidence of appellant's aggravated robbery establishes his motive and helps prove his intent to kill Wilcox and steal Wilcox's truck. Appellant's flight from the first offense, the fact that his car keys had been left, and his need of an automobile to effectuate his escape from the robbery of the men's clothing store crime help explain appellant's intentions when he came upon the victim. It is arguable appellant knew that his robbery had been reported and that the police were en route to Fayco Menswear. Because the evidence of the aggravated robbery was relevant to illustrate appel-

lant's motive and intent, the trial court did not err in admitting that evidence. Tex. R.Crim.Evid. 404(b); *see Peterson v. State*, 836 S.W.2d 760, 762–763 (Tex.App.—El Paso 1992, pet. ref'd) (Evidence of appellant's possession of marijuana, pistol and ammunition indicated defendant's motive and intent for his aggravated assault on peace officer).[3]

■ In appellant's second and third point of error, he complains the trial court erred in overruling his objection to the court's charge and in failing to limit the jury's consideration of the initial robbery to a proper purpose. During the charge conference, appellant objected to the inclusion of the court's instruction limiting the jury's consideration of the extraneous offense. Appellant objected to *any* limiting instruction being given at trial. In fact, the only reason the limiting instruction remained after appellant requested it be removed was because the State requested it remain, doing so "to protect the defendant's rights." *See Montgomery*, 810 S.W.2d at 388. Because appellant did not object or request a different more limited instruction, he cannot now complain of that failure. *See* Tex.Code Crim.Proc.Ann. art. 36.14; Tex. R.App.Proc. 52(a). Appellant's first three points of error are overruled.

■ In appellant's sixteenth point of error, he argues that the State's offer of a life imprisonment in return for a guilty plea should be admissible as mitigating evidence during the punishment phase of the trial. Specifically he avers that "his refusal to accept the proffered life sentence was due to the fact that he did not kill the complainant deliberately or intentionally and was therefore mitigating." The State argues evidence of plea offers is inadmissible under Rule 408 of the Texas Rules of Criminal Evidence. *See Moss v. State*, 860 S.W.2d 194, 196–197 (Tex.App.—Texarkana 1993, no pet.).[4]

Rule 408 provides:

---

**3.** Appellant's complaint on appeal is *only* that the evidence is not relevant. There is no argument that the evidence's probative value is substantially outweighed by the danger of unfair prejudice. Tex.R.Crim.Evid. 403.

**4.** Generally, evidence of a plea of guilty or nolo contendere which is subsequently withdrawn or evidence of statements made during plea negotiations are not admissible *against* a defendant.

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise *a claim which was disputed as to either validity or amount* is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice or interest or a witness or a party, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

(Emphasis added.) The U.S. Second Circuit Court of Appeals noted that reference in the Federal Rules to "a claim which was disputed as to either validity or amount" does not generally refer to criminal plea bargains. *United States v. Baker*, 926 F.2d 179, 180 (2nd Cir.1991).[5] *Baker* further held that Federal Rule 408 applies to civil matters only. *Id.; compare United States v. Hays*, 872 F.2d 582, 588–589 (5th Cir.1989) (Evidence of a civil settlement agreement is not admissible in a criminal proceeding), and *United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir.1994) (clear reading of rule 408 is that it applies to "civil proceedings" only). This interpretation of Rule 408 is buttressed by the presence of Rule 410 which prohibits the State from introducing evidence of a plea or statements made during plea negotiations against a defendant. Tex.R.Crim.Evid. 410.

■ The State cites to *Moss v. State*, *supra*, to support the proposition that because Rule 408 is in the Criminal Rules of Evidence, then the Rule applies to criminal settlement agreements as well. We agree that Rule 408 is applicable in criminal cases because of its presence in the Criminal Rules of Evidence, but we do not agree that it applies to criminal plea negotiations. *See Hays, supra; United States v. Gonzalez*, 748 F.2d 74, 78 (2nd Cir.1984) ("In this criminal prosecution, Gonzalez's statements were admitted to establish that Gonzalez committed a crime, and their relevance to that issue does not depend on an inference that [the Bank] had a valid claim against Gonzalez.") The rule is limited on its face to evidence which is presented to prove "the validity for or invalidity of [a] claim or its amount." Nothing in the State's offer of capital life during its plea negotiations concerns the validity or invalidity of a claim or its amount. While Rule 408 is applicable in criminal proceedings, it does not apply to a State's plea offer.

Nevertheless, if the trial court's decision was correct on any theory of law applicable to the case, it will be sustained. *McFarland v. State*, 845 S.W.2d 824, 846 n. 15 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Calloway v. State*, 743 S.W.2d 645, 652 (Tex.Crim.App.1988). The State's offer of life to a capital defendant was excludable on other grounds. Evidence that the State offered a capital defendant a plea of life may be *minimally* relevant to a State District Attorney's office belief that the defendant was not a future danger. Tex.R.Crim.Evid. 401 and 402; *Montgomery*, 810 S.W.2d at 386. However, such evidence is substantially outweighed by the danger of both unfair prejudice and of misleading the jury. Tex.R.Crim.Evid. 403. There are numerous reasons the State may offer a plea of capital life to a capital defendant, including the availability of county resources, the quality of evi-

---

Tex.R.Crim.Evid. 410. However, in this instance it was appellant and not the State that sought the admission of the terms of the State's plea offer.

**5.** "Claim" is defined by Black's Law Dictionary (5th Ed.1983) as,

To demand as one's own or as one's right; to assert; to urge; to insist. Cause of action. Means by or through which claimant obtains possession or enjoyment of privilege or thing. Demand for money or property, e.g. insurance claim.

dence or witnesses, internal policies within a district attorney's office, or a desire to prevent a victim's family from suffering the trauma of a capital trial. These various reasons could independently or in combination encourage the district attorney to make the offer of capital life. The limited probative value of the plea offer concerning a district attorney's views of a defendant's future dangerousness is substantially outweighed by the danger of "unfair prejudice, confusion of issues, or misleading the jury." Tex.R.Crim. Evid. 403.[6] Therefore, the trial court did not err in refusing appellant's request to introduce evidence of the State's plea offer. Appellant's sixteenth point of error is overruled.

■ In appellant's seventeenth point of error, he complains the trial court erred in admitting appellant's fingerprints into evidence as those prints were forcibly taken in violation of appellant's right against self-incrimination under Article I, section 10 of the Texas Constitution. Appellant's objection on appeal does not comport with his objection at trial which was based *solely* upon Fifth Amendment grounds. Tex.R.App.Proc. 52(a); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim.App.1990). Appellant's seventeenth point of error is overruled.

## II. CLOSING ARGUMENTS

In appellant's fourth and fifth points of error, he contends the prosecutor committed fundamental error and intentionally engaged in misconduct during his closing argument. The alleged improper argument occurred as follows:

> [STATE'S ARGUMENT:] Mr. Griffith tells you that he jumped the fence along with this guy named Larry. And you know what's so significant about Mr. Griffith's testimony is that he says that [appellant] and somebody else jumped the fence,

at about 12 to fifteen seconds later he hears a single gunshot.

[Appellant] wants you to believe that he negotiated with Mr. Wilcox. That all this as he said: Is he okay? Is he okay?

How much time? 12 to 15 seconds. What's going on through his mind at the time? And you know, when he left that Fayco Men's Department Store he forgot his keys. But [you] know what he didn't forget was his gun, that he didn't forget. He forgot his keys but not the gun. This loaded gun with a .32 [caliber] jacketed bullet that he's not going to forget that. Now, he's trying to get away. He knows the security guards are coming and he knows the police are coming. And at that point he's in the field. There aren't any witnesses except for Mr. Wilcox. No witnesses. And he needs to get away because, you know, there's people that are after him at the men's department store where nobody knew what was going on. Now, he knows people are after him and heeds [sic] the truck.

Now, the portions that are redacted under the law, as the law provides me that I have to do so, what do I leave out? He says the man was on top of a tent. How convenient. Man is found. Mr. Wilcox is found on top of a tent. That's where he got shot. He fell on it. I excised and I asked him politely, I excise politely now in order for you to be able to find the defendant not guilty of capital murder you got to be able to believe him. You got to be able to say, [appellant,] you're telling the truth. You've got to be able to believe him.

Now, do you think that in the course of trying to get away and he's got a loaded gun, he asks Mr. Wilcox can you please give me your keys to your truck? You really think that happened?

---

**6.** There also exists a separate policy reason to discourage the admission of those plea offers. If we were to permit the admission of such evidence, the State would be ably discouraged from making such offers in the future, and plea bargaining is essential to the administration of justice in America. *Moss*, 860 S.W.2d at 197; *see Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *United States v. Verdoorn*, 528 F.2d 103, 107 (8th Cir.1976); *Richardson v. State*, 667 S.W.2d 268, 269 (Tex. App.—Texarkana 1984, pet. ref'd).

*So in order for you to believe everything he says, you've got to be able to believe him.*

[APPELLANT'S COUNSEL:] Your Honor, I would object for the record in that that is a transfer of burden of proof in this case. That is where a person—

[THE STATE:] Your Honor, can I have an objection as opposed to a narrative objection?

THE COURT: Objection?

[APPELLANT'S COUNSEL:] Objection, it's transfer of burden of proof contrary to the law as stated in the Court's Charge.

THE COURT: To that extent, to the extent that might call for, the objection is sustained. The jury will be instructed to rely upon the Charge that puts the full burden of proof upon the State.

Proceed with the argument.

[THE STATE:] *I accept the burden, but you've got to be able to believe him.* (Emphasis added).

■ Appellant contends that the prosecutor's argument amounted to fundamental error, and therefore no objection is necessary to preserve error.[7] To be considered appropriate, jury argument must be limited to a summation of the evidence, reasonable deductions from the evidence, an answer to an argument by opposing counsel, or a plea for law enforcement. *Hughes v. State,* 878 S.W.2d 142, 157–158 (Tex.Crim.App.1992) (opinion on rehearing); *Moody v. State,* 827 S.W.2d 875, 894 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). The State contends that their argument in this instance was an answer to an argument by opposing counsel. During closing argument immediately before the State's alleged improper argument, appellant made the following argument:

Officer Williams said that this was the location where the (sic) found a truck, al-most twice the distance from where Mr. Griffith said that he heard the voices, twice the distance on this photograph by an officer who stakes out the scene.

Now, I don't know how a person who describes shadows acting frantically seated here, shadows basically dancing in the cab of a vehicle in this area, how a person determines when the headlights of that vehicle are on and supposedly coming towards him in this direction, how a person can determine not only how many people are in the cab of that truck, but the races and the number of voices heard, unless he finds out obviously afterwards and he knew that there were two people chased into the woods trying to get both suspects. I don't know if it makes sense. I don't think it bears up to the logic. But it's your decision. If Griffith is to believed (sic) and if you believe him, his testimony beyond a reasonable doubt, then [appellant] is wrong, [appellant's] testimony. He said that hey, Larry was inside the vehicle.

■ The arguments by counsel indicate that appellant did put the credibility of appellant's confession and Griffith's testimony into issue, forcing the jury to decide whom they believed. The State properly notes that their argument is not a shift in the burden of proof but rather a challenge to the credibility of appellant's exculpatory statements in his confession. Because appellant's counsel argued to the jury that they had to decide whom to believe, the State was also free to answer this argument and contend that appellant was not telling the truth.

■ In the fifth point of error, appellant contends the State committed prosecutorial misconduct by continuing to argue after the Court sustained appellant's objection that "I accept the burden, but you've got to be able to believe him." Appellant's argument is based on a belief that the trial court's ruling in this cause was to prevent the State from attacking appellant's credibility. However,

---

7. Appellant's complaint is based upon fundamental error because he failed to object again to the State's alleged improper shift in the burden.

such was not the court's ruling. The trial court's ruling was limited on its face to an improper shift in the burden during arguments, and not the State's attack on appellant's credibility.[8] Because the prosecutor's additional arguments were in response to the arguments of defense counsel, the trial court's limited ruling was correct. Appellant's fourth and fifth points of error are overruled.

## III. PAROLE LAW

In appellant's sixth through twelfth points of error, he complains of his inability to inform the jury, through testimony or an instruction, of the application of parole laws in Texas. In appellant's sixth point of error, he complains the trial court erred in preventing him from introducing the testimony of Dr. Fason that appellant would serve 15 years of his sentence before becoming eligible for parole. In his seventh through twelfth points of error, appellant argues that article 37.071 of the Texas Code of Criminal Procedure is violative of the Equal Protection Clause of the Fourteenth Amendment; the Equal Protection Clause of article I, sections 3 and 3a of the Texas Constitution; the Due Process Clause of the Fourteenth Amendment; the Due Course of Law provision of article I, sections 13 and 19 of the Texas Constitution; the Cruel and Unusual Punishment provisions of the Eighth Amendment; and the Cruel and Unusual Punishment provision of article I, section 13 of the Texas Constitution, respectively.

We have addressed appellant's contention in his sixth point of error in previous cases and held that it was not error for a trial court to refuse testimony be admitted

concerning parole. *Jones v. State*, 843 S.W.2d 487, 495 (Tex.Crim.App.1992). Traditionally, in Texas, parole is not a matter for a jury's consideration in a capital murder trial. *Id.; Ellason v. State*, 815 S.W.2d 656, 665, n. 5 (Tex.Crim.App.1991); *Stoker v. State*, 788 S.W.2d 1, 16 (Tex.Crim.App.1989), *cert. denied*, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). The subject is not proper even in the context of the second special issue because when a jury is considering whether a defendant represents a continuing threat to society, the term "society" includes *both* the prison and non-prison populations. *Jones*, 843 S.W.2d at 495; *Boyd v. State*, 811 S.W.2d 105, 118 n. 12 (Tex.Crim.App.1991). Therefore, as appellant's points of error have been previously raised and rejected, his sixth point of error is overruled.

### A. Texas Constitutional Challenges

In appellant's eighth, tenth, and twelfth points of error he contends his inability to inform the jury concerning parole violates the Equal Protection Clause, the Due Course of Law Clause, and the Cruel or Unusual provisions, respectively, of the Texas Constitution. Appellant recognizes our general ability to interpret our State Constitutional guarantees as broader than the Federal Constitution. *See Heitman v. State*, 815 S.W.2d 681 (Tex.Crim.App.1991).

#### 1. Texas Equal Protection Clause

Appellant contends that the Legislature's decision to keep parole information from capital juries yet inform non-capital juries of the same violates the Equal Protection Clause of the Texas Constitution.[9] In determining whether a criminal statute vio-

---

8. Nothing in this opinion is intended to limit the State's rights during closing argument to attack the veracity of a defendant who takes the stand or of the veracity of a defendant's exculpatory statement in a confession that is admitted at trial. *See Satterwhite v. State*, 858 S.W.2d 412, 424–425 (Tex.Crim.App.1993) (state may argue that witnesses for defense are not worthy of belief); *Greer v. State*, 523 S.W.2d 687, 690–691 (Tex. Crim.App.1975) (Where a defendant takes the witness stand and his testimony is clearly con-

trary to the State's evidence, it is not reversible error for the prosecutor to attack the veracity of the defendant.)

9. "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." Tex. Const. art. I, § 3. "Equality under the law shall not be denied or

lates the Equal Protection Clause of article I, section 3 of the Texas Constitution, we begin with the presumption that the purpose of the Statute is constitutional. *HL Farm Corp. v. Self,* 877 S.W.2d 288, 290 (Tex.1994); *Whitworth v. Bynum,* 699 S.W.2d 194, 196 (Tex. 1985); *Faulk v. State,* 608 S.W.2d 625, 630 (Tex.Crim.App.1980); *Ely v. State,* 582 S.W.2d 416, 419 (Tex.Crim.App.1979) (on rehearing); *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 561 (1916); *see Texas Public Building Authority v. Mattox,* 686 S.W.2d 924, 927 (Tex.1985); *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983). The party challenging the statute on equal protection grounds has the burden to show that the statutory classification is not rationally related to a legitimate state interest where interests other than fundamental rights or suspect classification are affected. *HL Farm Corp.,* 877 S.W.2d at 290; *Whitworth,* 699 S.W.2d at 196; *Sullivan v. University Interscholastic League,* 616 S.W.2d 170, 172 (Tex.1981).[10]

■ However, the classification must discriminate against *similarly situated individuals. See Ex parte Spring,* 586 S.W.2d 482, 486 (Tex.Crim.App.1979) (comparison of class C misdemeanor defendants whose cases filed in municipal court and those whose cases were filed in justice court). In this instance appellant's equal protection complaint is not among similarly situated individuals, that is, he is treated the same as all capital defendants.[11] *See Knox v. State,* 744 S.W.2d 53, 63 (Tex.Crim.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988) (entire capital punishment scheme is different than non-capital punishment scheme); *Butler v. State,* 872 S.W.2d 227, 240

(Tex.Crim.App.1994) (capital sentencing scheme that permits jury consideration of unadjudicated offenses which differs from punishment scheme in non-capital cases does not violate federal equal protection); *Janecka v. State,* 739 S.W.2d 813, 833 (Tex.Crim. App.1987) (differing procedures of jury voir dire in capital and non-capital cases does not violate federal equal protection). Appellant's eighth point of error is overruled.

### 2. Other Texas Challenges

In appellant's tenth and twelfth points of error, he argues that failure to instruct the jury on parole violates the due course of law clause of the Texas Constitution and the prohibition against Cruel or Unusual Punishment in the Texas Constitution. However, appellant's arguments are based entirely upon the federal constitution.[12] Appellant proffers no argument or authority of how the protection offered by the Texas Constitution differs from the protection guaranteed by the U.S. Constitution. *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993). We are not inclined to make appellant's arguments for him. *Id.;* Tex.R.App.Proc. 74 and 210. Appellant's tenth and twelfth points of error are overruled.

### B. Federal Constitutional Challenges

### 1. Equal Protection Clause

■ In appellant's seventh point of error, he complains the differing instructions to capital and non-capital defendants in Texas violates the Equal Protection Clauses of the

---

abridged because of sex, race, creed, or national origin." Tex. Const. art. I, § 3a.

**10.** Appellant's brief includes some cases concerning an infringement of a "fundamental right," thus requiring a strict scrutiny review. However, appellant makes no argument, and we can see none, that would indicate that capital defendants constitute a "suspect class."

**11.** If the statute applicable to non-capital defendants did violate the equal protection clause, the remedy would appear to be that *no* defendant would benefit from the statute. It would not be this Court's duty to expand a legislative statute, but rather, to strike the statute completely.

**12.** Appellant does assert that he believes the Texas Constitutional provision concerning Cruel or Unusual Punishment is broader than the federal constitution. His argument, though, ends there.

U.S. Constitutions.[13] We disagree. In *Knox v. State*, we noted that the "entire sentencing structure and punishment scheme in capital cases has always been different from the sentencing procedure in non-capital cases...." 744 S.W.2d at 63. This Court further held in *Knox* that these differing procedures concerning parole instructions do not violate the Equal Protection Clause. *Id.; see Butler, supra; Janecka v. State, supra.*[14] Appellant's seventh point of error is overruled.

### 2. Due Process

In the ninth point, appellant asserts that failure to inform the jury of the nature of parole for capital defendants violates the Due Process Clause of the U.S. Constitution. During trial appellant's expert, Dr. Fason, testified concerning appellant's mental condition. In Dr. Fason's opinion appellant suffered from an antisocial reaction. Appellant's prognosis was also discussed. Dr. Fason testified as follows,

> The prognosis is kind of interesting because the psychiatric records and treating individuals' records by and large has been very, very poor. They don't fit into the psychiatric mode. They don't have a respect for the truth that is necessary when you depend upon words for communication and thereby enlarge just using words to manipulate people rather than communicate. And so it's the ordinary techniques and methods of psychiatry are not very helpful. As far as the prognosis is concerned, the most interesting thing about it, even though psychiatry has not by and large been affected there are some exceptions to that. It has been that you see a

lot of people in their twenties with this diagnosis. Anyone in the criminal justice system who has been here a while sees an awful lot of people who are 18 to 29 that would fall into that category. When people get past the age of 30 you don't see that many in the criminal justice system. And past age 40 you rarely ever see someone with this diagnosis past the age of 40.

Appellant argues the recent Supreme Court plurality decision in *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) and their action in *Price v. North Carolina,* —— U.S. ——, 114 S.Ct. 2777, 129 L.Ed.2d 888 (1994), indicate that a formal instruction concerning a defendant's parole eligibility may be required under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. In *Simmons v. South Carolina, supra,* a plurality of the Supreme Court held that "where the [capital] defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." —— U.S. at ——, 114 S.Ct. at 2190. In *Price,* the Supreme Court reversed, vacated, and remanded Price's case to the North Carolina Supreme Court for further action not inconsistent with *Simmons.* Price, unlike Simmons, was parole eligible in twenty years.

Initially, we must address appellant's contention that the Supreme Court's action in *Price* indicates that *Simmons* has been extended to parole eligible defendants. We absolutely reject this premise. The Supreme Court's action in *Price* does not hold any precedential value or send a "signal" as to the proper disposition of Price's case. In

---

**13.** In Texas, a jury which assesses punishment in a non-capital defendant's case is informed of the effect of "good conduct time" to the sentence and the potential of early release due to parole. Tex.Code Crim.Proc. ann. art. 37.07, § 4.

**14.** While, it is unclear whether the Equal Protection Clause is even relevant to differing sentencing procedures for different crimes, there is a rational basis for the difference between capital and non-capital cases. In a capital crime the jury does not assess punishment, whereas, in a non-capital crime the jury does assess punish-

ment. *Compare* Tex.Code Crim.Proc. ann. art. 37.07, § 4(a) ("In the penalty phase of the trial of a felony case in which the punishment is to be assessed by the jury rather than the court ...") to art. 37.071(e) ("If the jury returns [the appropriate findings to the special issues,] the court shall sentence the defendant to death.") Therefore, even if the Equal Protection Clauses were to apply, there is a rational basis for treating the two classes of defendant's differently.

fact, the Supreme Court of North Carolina has again recently reaffirmed Price's case in light of *Simmons*. *State v. Price*, 337 N.C. 756, 448 S.E.2d 827 (N.C.1994). We do agree with appellant that *Simmons* indicates that in some instances a jury may be required to be informed of a defendant's parole eligibility.[15] However, in Texas this is generally not the case.

■ Initially, we note that the Texas Constitution prohibits, without legislative action, the jury to consider parole in any manner when considering whether a capital defendant should be sentenced to life or death. *Elliott v. State*, 858 S.W.2d 478, 489 n. 7 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 563, 126 L.Ed.2d 463 (1993); *Boyd v. State*, 811 S.W.2d 105, 121 (Tex.Crim.App. 1991). Absent a federal constitutional requirement to the contrary, it will remain the policy of Texas not to officially inform jurors of the actual consequences of a life sentence.[16] Prior to *Simmons*, the Supreme Court had indicated that whether a jury was informed concerning parole was traditionally a determination left to the States. *See Simmons*, —— U.S. at ——, 114 S.Ct. at 2196 ("It is true that [*California v.*] *Ramos*[, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983),] stands for the broad proposition that we generally will defer to a State's determination as to what a jury should and should not be told about sentencing. In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole."); —— U.S. at ——, 114 S.Ct. at 2200 (O'Connor, J., concurring); *California v. Ramos*, 463 U.S. at 1013, n. 30, 103 S.Ct. at 3460, n. 30 (1983) ("Many state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or parole."); *Knox v. Collins*, 928 F.2d 657, 660 (5th Cir.1991) (Constitution does not compel instruction on parole.); *King v. Lynaugh*, 850 F.2d 1055, 1059–1061 (5th Cir. 1988) (en banc), *cert. denied*, 489 U.S. 1093,

**15.** During punishment the trial court instructed the jury that "if the [jury] return[s] a negative finding on any special issue submitted to [the jury,] the court shall sentence the defendant to the institutional division of the Texas Department of Criminal Justice for life." They were instructed "not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all the evidence before you and in answering the special issues." The jury was further instructed that, during their "deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or of the Governor, or how long the defendant will be required to serve to satisfy a sentence of life imprisonment."

**16.** While we may be sympathetic to the notion of having a jury informed of the State provisions for parole, such decision has been left to the legislature. Tex. Const. art. 4, § 11. We recognize, however, that other problems may surface if a jury were informed of the minimum number of years a capital defendant must serve before being eligible for parole. Our capital trials could quite possibly turn into mini-trials on prison space and parole policies and whether the legislature may in a future year reduce the minimum number of years prior to parole consideration. In his dissenting opinion to *California v. Ramos*, Justice

Marshall indicated the problems with allowing juries to consider concepts of parole in their deliberations.

> A jury simply has no basis for assessing the likelihood that a particular defendant will eventually be released if he is not sentenced to death. To invite the jury to indulge in such speculation is to ask it to foretell numerous imponderables: the policies that may be adopted by unnamed future Governors and parole officials, any change in the defendant's character, as well as any other factors that might be deemed relevant to the commutation and parole decisions.

463 U.S. 992, 1020–1021, 103 S.Ct. 3446, 3463 (1983) (Marshall, J. dissenting). Judge Teague indicated another concern in his concurring opinion in *Andrade v. State*,

> In fact, advising jurors that a life penalty is theoretically modifiable, and thus not "final," might incline them to approach their fact finding duty with less appreciation for the gravity of the answers to the submitted questions and for the moral responsibility reposed in them as fact finders. In short, such an instruction disclosing the Governor's power to commute a life sentence might operate to a defendant's severe disadvantage and to his extreme prejudice.

700 S.W.2d 585, 590 (Tex.Crim.App.1985) (Teague, J. concurring).

109 S.Ct. 1563, 103 L.Ed.2d 930 (1989) (Federal Constitution does not require voir dire inquiry concerning potential jurors views of parole.); *Andrade v. McCotter*, 805 F.2d 1190, 1192–1193 (5th Cir.1986) (No constitutional violation to the denial of a parole instruction under the Cruel and Unusual Punishment Clause of the Eight Amendment and the Due Process Clause of the Fourteenth Amendment.); *O'Bryan v. Estelle*, 714 F.2d 365, 388–389 (5th Cir.1983) (An instruction on parole is not required under the Due Process Clause of the Fourteenth Amendment).

The question then becomes when does the Due Process Clause require the jury to be informed of a defendant's parole eligibility in contravention of our State Constitution. We note that the *Simmons* opinion on its face seems to be limited to states which have life without parole and not to states which have life with parole eligibility.[17] *Simmons*, —— U.S. at ——, 114 S.Ct. at 2200 (O'Connor, J., concurring) ("In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact."); *see Allridge v. Scott*, 41 F.3d 213, 220–222 (5th Cir.1994) ("We therefore read *Simmons* to mean that due process requires the state to inform a sentencing jury about a defendant's parole ineligibility when, and only when, (1) the state argues that a defendant represents a future danger to [free] society, and (2) the defendant is legally ineligible for parole." [footnotes omitted].); *Kinnamon v. Scott*, 40 F.3d 731, 733 (5th Cir.1994) ("If we were to ignore the absence of a contemporaneous objection and

the bar of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), we would not extend *Simmons* beyond cases in which the sentencing alternative to death is life without parole."); *Ingram v. Zant*, 26 F.3d 1047, 1054 n. 5 (11th Cir.1994) (*Simmons* was not applicable in Georgia "because prior to May 1, 1993, Georgia law did not provide for life imprisonment without parole."); *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994) (*Simmons* inapplicable because appellant was eligible for parole); *Ramdass v. Commonwealth*, 248 Va. 518, 450 S.E.2d 360, 361 (1994) (*Simmons* only applicable if Radmass was ineligible for parole at time of conviction.); *Wright v. Commonwealth*, 248 Va. 485, 450 S.E.2d 361, 362 (1994) (same); *see also State v. Southerland*, 447 S.E.2d 862 (S.C.1994) (trial courts are now required to inform the jury, upon request of counsel, a defendant's parole ineligibility following *Simmons.*); *but see Clark v. Tansy*, 118 N.M. 486, 882 P.2d 527 (1994) (*Simmons* was held applicable). However, this is not the only distinction that can be drawn between the Texas sentencing system and *Simmons*.

In *Simmons* the Supreme Court relied upon their earlier plurality opinion in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) in holding the South Carolina procedure violated due process. *Simmons*, —— U.S. at ——, 114 S.Ct. at 2192. In *Gardner* a plurality of the Court held that a defendant could not be executed "on the basis of information which he had no opportunity to deny or explain." 430 U.S. at 362, 97 S.Ct. at 1207. There the trial court or-

---

17. "Judge Clinton's dissent contends that *Simmons* should be interpolated to read that whenever the State argues future dangerousness, parole is an issue of which the jury must be informed. Op. at 870. This proposition is supported in greater part by Justice Scalia's dissent than the plurality or concurring opinions of the Court. In fact to read *Simmons* so broadly would be to ignore the basic holding of the plurality opinion and Justice O'Connor's concurring opinion. The plurality opines, "We hold that where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons*, ——

U.S. at ——, 114 S.Ct. at 2190. Justice O'Connor agreed and similarly narrowed what she would hold, asserting that "due process requires that the defendant be allowed to [inform the jury of parole] in cases in which the only available alternative sentence to death is life imprisonment without the possibility of parole" and the prosecution argues future dangerousness. *Simmons*, —— U.S. at ——, 114 S.Ct. at 2201 (O'Connor, J. concurring).

While we believe *Simmons* is distinguishable based upon this fact alone, we also believe the underlying rationale for the Supreme Court in *Simmons* based upon *Gardner, supra*, is inapplicable to Texas jurisprudence.

dered a presentence investigation report to be conducted while the jury was deliberating.[18] 430 U.S. at 352–353, 97 S.Ct. at 1201–02. The jury returned an advisory verdict of life. Some three weeks later, the trial court disregarded the jury's advise and sentenced Gardner to death. This sentence was in part based upon the factual information contained in the presentence investigation report, a portion of which was confidential and not disclosed to Gardner's defense counsel. Gardner was denied due process because the trial court relied upon relevant evidence which Gardner had no opportunity to deny or explain. 430 U.S. at 362, 97 S.Ct. at 1206–07. Clearly it cannot be true that the Due Process Clause commands a trial court or an attorney to correct community misunderstandings concerning the judicial system, unless those misunderstandings are somehow injected into the trial by one of the parties. *Gardner*, therefore, indicates that a jury or judge cannot determine a defendant's sentence based upon evidence or information presented at trial which the defendant has not been given an opportunity to rebut or explain. The critical question thus becomes, what information injected by the prosecution in South Carolina did Simmons not have the opportunity to rebut or explain.

In South Carolina, the jury determines whether a defendant should be sentenced to death. S.C.Code Ann. § 16–3–20(C) (Law. Co-op. 1976). In *Simmons* the prosecution urged the jury to vote for the death penalty because Simmons would be released from prison.[19] The Court noted that the prosecutor argued that Simmons' "future dangerousness was a factor for the jury to consider when fixing the appropriate punishment." —— U.S. at ——, 114 S.Ct. at 2190. "In this case, the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." —— U.S. at ——, 114 S.Ct. at 2193; *see* —— U.S. at ——, 114 S.Ct. at 2199 (Ginsburg, J., concurring) ("When the prosecution urges a defendant's future dangerousness as cause for the death sentence, the defendant's right to be heard means that he must be afforded an opportunity to rebut the argument."); —— U.S. at ——, 114 S.Ct. at 2200 (O'Connor, J., concurring) ("But 'where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty …' ").

18. In Florida, the jury verdict at punishment merely advises the trial court of the defendant's sentence. *Gardner*, 430 U.S. at 352, 97 S.Ct. at 1201–02.

19. The concept of future dangerousness throughout the opinion in *Simmons* is different than that in Texas in one important respect. In South Carolina, the prosecutor is urging the jury to sentence an individual to death because he will at some future date be released from prison. The plurality opinion complained that prosecutors in South Carolina "urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison." *Simmons*, —— U.S. at ——, 114 S.Ct. at 2193. In her concurring opinion, Justice O'Connor characterized South Carolina's argument as attempting to "show that [Simmons was] a vicious predator who would pose a continuing threat to the community." —— U.S. at ——, 114 S.Ct. at 2200.

In Texas, a prosecutor is urging a jury to answer a specific question, called "future dangerousness," in the affirmative. The question asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim.Proc. ann. art. 37.071 § 2(b)(1) and 37.0711 § 3(b)(2). "Society" has been defined to include both prison and non-prison populations. *Jones v. State*, 843 S.W.2d 487, 495 (Tex.Crim.App.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Boyd v. State*, 811 S.W.2d 105, 118 n. 12 (Tex.Crim.App.), *cert. denied*, 502 U.S. 971, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991). The argument in Texas by the prosecutor is that the defendant will commit criminal acts of violence whether he is in prison or out of prison. This question is much more abstract than that asked in the argument urged in South Carolina. *See Allridge v. Scott*, 41 F.3d 213, 222 n. 12 (5th Cir.1994) ("We note that *Simmons* particularly applies to those cases in which the state argues that the defendant is a future danger to free society. But when the state argues that the defendant poses a future danger to everybody, fellow inmates included, then *Simmons* is inapplicable because whether the defendant is eligible for parole is irrelevant." [cite omitted.] ).

In fact this was Simmons' very argument to the Supreme Court. He "argued that, in view of the public's apparent misunderstanding about the meaning of 'life imprisonment' in South Carolina, there was a reasonable likelihood that the jurors would vote for death simply because they believed, mistakenly, that [he] eventually would be released on parole." —— U.S. at ——, 114 S.Ct. at 2191.

 More troubling in South Carolina was the apparent absence of procedural protections to prevent a jury's misunderstanding of parole. In Simmons' trial, "defense counsel was forbidden even to mention the subject of parole, and expressly was prohibited from questioning prospective jurors as to whether they understood the meaning of a ' "life" ' sentence under South Carolina law." —— U.S. at ——, 114 S.Ct. at 2190. Simmons was barred from even inquiring whether potential jurors could disregard the subject of parole in determining his appropriate punishment. *Simmons*, —— U.S. at ——, 114 S.Ct. at 2190. In Texas, however, we have provided numerous safety measures to prevent such a misunderstanding. While our juries are not informed of a meaning of a life sentence, *Boyd*, 811 S.W.2d at 118–119, counsel is permitted to examine each prospective juror extensively about whether they can obey an instruction forbidding their consider-

ation of parole in their deliberations, and jurors unable to set aside parole from their consideration of the sentence are challengeable for cause. *Jackson v. State*, 822 S.W.2d 18, 27 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 3034, 125 L.Ed.2d 722 (1993); *Felder v. State*, 758 S.W.2d 760, 762–67 (Tex.Crim.App.1988); *Ellason v. State*, 815 S.W.2d 656, 665–666 (Tex.Crim.App. 1991); *Mays v. State*, 726 S.W.2d 937, 950 (Tex.Crim.App.1987), *cert. denied,* 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1020 (1988). Additionally, the State is not permitted to argue to the jury that a defendant should be sentenced to death because he will be released from prison on parole.[20] *Franklin v. State*, 693 S.W.2d 420, 429 (Tex.Crim.App. 1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986).[21] And finally, were a jury to consider parole in its deliberations a defendant may be entitled to a new trial. Tex.R.App.Proc. 30(b)(7); *Buentello v. State*, 826 S.W.2d 610, 610–614 (Tex.Crim. App.1992); *Ex parte Welborn*, 785 S.W.2d 391, 395 (Tex.Crim.App.1990); *Callins v. State*, 780 S.W.2d 176, 191 (Tex.Crim.App. 1986), *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3256, 111 L.Ed.2d 766 (1990); *Sneed v. State*, 670 S.W.2d 262, 266 (Tex.Crim.App.1984).[22]

 In the instant case, the issue of appellant's potential early release from prison based upon parole, pardon or commuta-

---

**20.** In non-capital cases, prior to the constitutional amendment, it has traditionally been error for a prosecutor to urge a jury to consider parole when they are determining the appropriate sentence of a defendant. *See Roberts v. State*, 800 S.W.2d 536, 538 (Tex.Crim.App.1990); *Johnson v. State*, 797 S.W.2d 658 (Tex.Crim.App.1990); *Rose v. State*, 752 S.W.2d 529, 532 (Tex.Crim. App.1987) (on rehearing); *Clark v. State*, 643 S.W.2d 723, 725 (Tex.Crim.App.1983) (panel opinion); *Woerner v. State*, 576 S.W.2d 85, 86–87 (Tex.Crim.App.1979); *Jones v. State*, 564 S.W.2d 718, 720–721 (Tex.Crim.App.1978); *Clanton v. State*, 528 S.W.2d 250 (Tex.Crim.App.1975); *Marshburn v. State*, 522 S.W.2d 900, 901 (Tex. Crim.App.1975); *Hughes v. State*, 493 S.W.2d 166, 169 (Tex.Crim.App.1973); *Graham v. State*, 422 S.W.2d 922, 927 (Tex.Crim.App.1968).

**21.** This Court has occasionally found no error where parole was interjected into trial when the subject was initiated by appellant himself or where the State was answering an argument by defense counsel. *See e.g., Coleman v. State*, 881 S.W.2d 344, 358 (Tex.Crim.App.1994) (permissi-

ble answer to argument); *Moody v. State*, 827 S.W.2d 875, 894 (Tex.Crim.App.1992) (parole discussed by appellant's expert on cross-examination without objection).

**22.** We also recognize that were a prosecutor, in his or her arguments concerning the new special issue, to urge the jury not to give a defendant a life sentence because he would serve a limited number of years in prison, then *Simmons* may command that the jury be informed of the minimum prison terms for capital life prisoners. *See* Tex.Code Crim.Proc.Ann. art. 37.071 § 2(e) (jury is asked, "whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."); *Clark v. Tansy*, 118 N.M. 486, 882 P.2d 527 (1994) (prosecutor argued that it was not a matter of whether defendant would get out but when, and somewhere down the road there would be more victims).

tion, was not placed before the jury either through argument or evidence.[23] Therefore, due process did not require that appellant be permitted to inform the jury of the meaning of "life" imprisonment. Because Texas does not allow parole information to enter the jury's deliberations, a defendant is not sentenced based upon information which he has had no opportunity to rebut or explain.[24] Appellant was not denied due process of law when the trial court refused to instruct the jury on parole. The trial court properly followed the Texas Constitutional commands in prohibiting parole from being considered by a capital jury. Appellant's points of error are overruled.

### 3. Eighth Amendment

■ In appellant's eleventh point of error, he contends that failure to inform the jury about parole violated the Eighth Amendment. This contention was raised and

23. *See Madden v. Collins*, 18 F.3d 304, 310 (5th Cir.1994) (Argument by prosecutor, "[a]nd if we don't take him off the streets permanently by answering these questions yes, who will be next in that path?" and instruction by judge to jury not to consider possibility of parole were held not to be improper references to parole.)

24. The number of years before a defendant is eligible for parole is not relevant to this due process analysis. The only question is whether parole is available, whether the State interjects the subject of parole into the trial, and whether safeguards exist in the State to prevent such information from becoming part of the sentencing process.

25. In his dissent, Judge Maloney directs our attention to Legislative attempts and public movements urging "Truth in Sentencing." Op. at 884–886. He contends further that a State policy of informing the jurors in capital cases of the minimum eligibility of parole *would facilitate* this "Truth in Sentencing." Judge Maloney's argument is strongly persuasive, if we were legislators and not jurists. The choice of determining what a jury should consider is generally legislative. *See California v. Ramos*, 463 U.S. 992, 1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983) ("We sit as judges, not as legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States.") *Gregg v. Georgia*, 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976) ("It seems clear that the problem [of channeling jury discretion] will be alleviated if the jury is given guidance regarding the factors about the

rejected in *Elliott v. State*, 858 S.W.2d 478, 489–490 (Tex.Crim.App.1993). *Simmons* was confined to Due Process analysis only, and the Court expressly stated that they were not addressing any Eighth Amendment claims. —— U.S. at ——, 114 S.Ct. at 2193, n. 4. We note, however, that the concept of parole eligibility "bears no relationship to the nature of the offense or the character of the offender." *Andrade v. State*, 700 S.W.2d at 590 (Teague, J., concurring); *see also California v. Ramos*, 463 U.S. 992, 1021, 103 S.Ct. 3446, 3464, 77 L.Ed.2d 1171 (1983) (Marshall, J., dissenting) ("[The possibility of parole or commutation] bears no relation to the defendant's character or the nature of the crime, or to any generally accepted justification for the death penalty.")[25] Appellant's twelfth point of error is overruled.

## IV. CHARGE ISSUES

■ In appellant's thirteenth through fifteenth points of error, he complains the trial

crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision.")

The dissent also contends that this evidence is mitigating and thus the jury should be instructed concerning the minimum incarceration terms for capital life prisoners. This evidence, however, does not concern "the character and record of the individual offender" or the "circumstances of the particular offense." *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1978); *California v. Ramos*, 463 U.S. at 1006, 103 S.Ct. at 3456 ("As with the Texas scheme, the California sentencing system ensures that the jury will have before it information regarding the individual characteristics of the defendant and his offense, including the nature and circumstances of the crime and the defendant's character, background, history, mental condition, and physical condition.")

As the Supreme Court noted in *Ramos*,
Our conclusion [that an instruction informing the jury of a governor's power of commutation does not violate the Eighth and Fourteenth Amendments] is not intended to override the contrary judgment of state legislatures that capital sentencing juries in their states should not be permitted to consider the Governor's power to commute a sentence. It is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires.
463 U.S. at 1013–1014, 103 S.Ct. at 3460. Judge Maloney's compelling dissent should properly be reviewed and considered. However, the body to consider such an argument is the Legislature and the public and not ourselves.

court erred in overruling his proposed instruction concerning mitigating evidence, in overruling his objection to the instruction given, and in refusing to include his fourth special issue, respectively. Appellant's request for a mitigating instruction is based upon *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[26] Because we have previously approved of the identical nullification instruction given in this case, appellant's thirteenth and fourteenth points of error are overruled. *Riddle v. State*, 888 S.W.2d 1, 8 (Tex.Crim.App.1994); *Goynes v. State*, No. 71387 (Tex.Crim.App. delivered Dec. 12, 1994).[27] We have also previously held that a trial court does not err in submitting a "nullification instruction" rather than a separate special issue. *Robertson v. State*, 871 S.W.2d 701, 710 (Tex.Crim. App.1994). Appellant's fifteenth point of error is overruled.

In the eighteenth point of error, appellant argues the trial court erred in correcting an erroneous charge after deliberations began but prior to the jury's verdict. The trial court submitted conflicting instructions to the jury. The court first instructed the jury that they cannot consider the extraneous offenses for purposes of answering the special issues unless they find the extraneous offenses were committed by appellant beyond a reasonable doubt. The court then instructed the jury that they could only consider the extraneous offenses when passing upon the weight of "said testimony" and for no other purpose.[28] After arguments, the jury began deliberations, and one hour later recessed for lunch. At that point the trial court removed the second conflicting instruction. On appeal, appellant does not object to the content of the corrected charge. At trial, appellant did not object to the charge being altered after arguments had begun. Appellant mentioned that there were possible objections, but he failed to make any.[29]

Article 36.16 of the Texas Code of Criminal Procedure has been interpreted to permit a trial court to withdraw and correct its charge if convinced an erroneous charge has been given.[30] *Bustillos v. State*, 464 S.W.2d 118,

**26.** Appellant was tried in February of 1992. Because his trial occurred before September 1, 1993, appellant did not receive the new special issue concerning mitigation. *See* Tex.Crim.App. art. 37.071 § 2(e) (for offenses committed on or after September 1, 1991) and 37.0711 § 3(e) (for offense committed before September 1, 1991).

**27.** As appellant received a proper nullification instruction, we need not reach the issue of whether he proffered sufficient evidence to raise a *Penry* issue sufficient to warrant an instruction. *See Robison v. State*, 888 S.W.2d 473, 486–487 (Tex.Crim.App.1994); *Penry*, 492 U.S. at 329, 109 S.Ct. at 2952; *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

**28.** The problem in this instance concerns two conflicting instructions presented to the jury. The charge instructed the jury that:

> You are further instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the special issues.

In the following page, which was removed, the jury was further instructed:

> You are instructed that certain evidence was admitted before you in regards to defendant having been charged and convicted of an offense or other [sic] than the one for which he is now on trial.
> Said evidence was admitted before you for purposes of aiding you if it does aid you in passing upon the weight you will give this testimony and you will not consider the same for any other purposes.

**29.** Appellant's attorney stated:

> There are a number of issues that give rise to possible objection to increase perhaps if in fact if they started deliberating had made a decision on any particular aspect of this case. With the impact, for instance, might be on argument concerning extraneous offenses related to any particular issue whether or not some type of jeopardy has attached.

**30.** Article 36.16 of the Code provides, in part:

> After the argument begins no further charge shall be given to the jury unless required by the improper argument of counsel or the request of the jury, or unless the judge shall, in his discretion, permit the introduction of other testimony.

125–126 (Tex.Crim.App.1964); *Nowlin v. State*, 76 Tex.Cr.R. 480, 175 S.W. 1070, 1072 (1915). Appellant argues these cases should be abandoned because to permit the revision of the charge after argument has begun is to also permit sloppy lawyering.

In 1913, the Texas Legislature amended the procedures relating to jury charges enacting article 737a of the Code of Criminal Procedure. Tex.S.B. 166 (1913). In 1915, this Court recognized that if interpreted literally, the court would have "no right over appellant's objection to change his charge or give any additional charge, in any contingency after the argument has been concluded, except those mentioned" in the article. *Nowlin*, 175 S.W. at 1072. Nevertheless, the Court held that,

> taking all of our statutes and previous decisions into consideration, and the purpose and object of the legislature in making the changes by said act of 1913, said article 737a should not be construed to prohibit the court absolutely under all circumstances from changing or adding to his charge.

*Id.* This has remained the law in Texas. *See Bustillos*, 464 S.W.2d at 125–126 ("In light of purpose of [art. 36.16] the court may before verdict withdraw and correct its charge if convinced an erroneous charge has been given."); *Chambers v. State*, 379 S.W.2d 907, 908 (Tex.Crim.App.1964) ("If the matter is before us, we find no error in the court's amending his charge in order to correctly state the law."); *Hill v. State*, 92 Tex.Crim. 312, 243 S.W. 982, 983 (App.1922) ("... we think it not open to question as to the right of the trial court to withdraw his charge after the conclusion of the argument .."); *Jacobs v. State*, 213 S.W. 628, 628–629 (Tex.Crim. App.1919) (appellant may waive right to complain of agreed alteration in charge after jury arguments); *Gaines v. State*, 710 S.W.2d 630, 632–633 (Tex.App.—Corpus Christi 1984, pet. ref'd); *Morlett v. State*, 656 S.W.2d 603, 606 (Tex.App.—Corpus Christi 1983, no pet.); *Smith v. State*, 635 S.W.2d 591, 593 n. 1 (Tex.App.—Dallas 1982, no pet.) (on rehear-

ing); *see Murray v. State*, 857 S.W.2d 806, 808–809 (Tex.App.—Fort Worth 1993, no pet.) (late supplementation of charge, over objection, which undercut defendant's defense and jury argument denied defendant fair trial); *Moore v. State*, 848 S.W.2d 920, 922 (Tex.App.—Houston [1st Dist.] 1993, pet ref'd) (not permissible where amended charge was to defendant's detriment and over his objection). In urging this Court to abandon *stare decisis*, appellant argues that continuing the practice of correcting erroneous jury instructions after arguments are concluded will encourage "sloppy" lawyering. However, appellant's concern is empirically unfounded, as is illustrated by the few cases complaining of a trial court's correction of an erroneous charge. We are not inclined to overrule these precedents based upon appellant's arguments in this case. Appellant's eighteenth and final point of error is overruled.

Appellant's conviction and the judgment of the trial court are affirmed.

BAIRD, Judge, concurring.

The central issue in this case can be stated as follows: In light of *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), does the Due Process Clause of the United States Constitution require that the jury be informed of how long a capital murder defendant will be confined before being parole eligible in the event he is sentenced to confinement for life rather than death.

## I.

Prior to *Simmons* our law was clear, the matter of parole or a defendant's release thereon was not proper for a jury's consideration in a capital murder trial and a capital murder defendant was not entitled to a jury instruction explaining our parole laws. *Stoker v. State*, 788 S.W.2d 1, 16 (Tex.Cr.App. 1989); *O'Bryan v. State*, 591 S.W.2d 464, 478 (Tex.Cr.App.1979); *and, Andrade v. State*, 700 S.W.2d 585, 587 (Tex.Cr.App.1985). These holdings were not subject to federal

attack because the States have the power to determine whether their criminal justice system will allow such an instruction; Due Process neither compels, nor prohibits, a jury instruction on state parole laws. *California v. Ramos*, 463 U.S. 992, 1013–1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983). Appellant questions the continued viability of these cases in light of *Simmons*.

## II.

*Simmons* is composed of five separate opinions; the lead opinion, authored by Justice Blackmun, failed to garner a majority of the Court. Such a resolution provides little guidance to the bench and bar. Moreover, the future of the affected area of the law remains uncertain. When the law is uncertain, appellate court judges have little confidence in how to proceed when confronted with similar issues. In these situations, this Court has opted to read Supreme Court opinions in their most narrow light.[1]

In this narrow light, the plurality holds *Simmons* has no application because, unlike South Carolina, a Texas capital murder defendant sentenced to confinement for life is eligible for parole. This narrow reading is supported by two of the opinions in *Simmons*. In his plurality opinion Justice Blackmun stated:

> ... In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole.

*Simmons*, —— U.S. at ——, 114 S.Ct. at 2196. In her concurring opinion, Justice O'Connor stated: "In a State in which parole

is available, the Constitution does not require (or preclude) jury consideration of [parole eligibility]." *Id.*, at ——, 114 S.Ct. at 2200 (O'Connor, J., concurring).

Under the instant interpretation of *Simmons*, there will never be a Due Process violation as long as the possibility of parole exists, regardless of how remote.

## III.

Today, a Texas capital murder defendant sentenced to life must serve 40 years before being eligible for parole. One might question whether there is a meaningful distinction between life without the possibility of parole and being parole eligible after serving 40 years in confinement. Would due process be violated if our law provided that a capital murder defendant must serve 100 years in confinement before being parole eligible? Or 1,000 years? From my reading of *Simmons*, the Supreme Court perceives a distinction. While the dissenters may argue that such a distinction promotes form over substance, it is nevertheless a distinction of Constitutional magnitude in the mind of the *Simmons* Court.

## IV.

Based upon the Supreme Court's treatment of its own decisions, I believe *Simmons* is a fact bound opinion. *See, Mines v. State*, 888 S.W.2d 816, 817 (Tex.Cr.App.1994) (op. on remand from United States Supreme Court) (Baird, J., concurring). Because *Simmons* is limited to cases where the defendant is ineligible for parole, and because appellant is eligible for parole, there is no due process violation.[2]

With these comments, I join only the judgment of the Court.

1. This narrow interpretation has had the practical affect of overruling the Supreme Court opinion. *See, Robison v. State*, 888 S.W.2d 473, 485–489 (Tex.Cr.App.1994) *sub silentio* overruling *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

2. I am in general agreement with Judge Maloney's well written and well reasoned dissent

which finds a violation of the Eighth Amendment. However, only two of the Justices in *Simmons* addressed the Eighth Amendment. Consequently, Judge Maloney's holding appears to be even more tenuous than finding a due process violation. Therefore, I believe it more prudent for the Supreme Court to resolve the Eighth Amendment issue. Hopefully, that resolution will garner more than a plurality of Court.

MANSFIELD, Judge, concurring.

Appellant argues that in light of *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the Due Process Clause of the Fourteenth Amendment to the United States Constitution mandates that the jury in a capital murder case be told how much time the defendant will be required to serve in the event he is sentenced to life in prison rather than to death.

It is important to note that *Simmons* is a collection of five separate opinions and there is *no* majority opinion. As such, the precedential value of *Simmons* is limited, though it is fair to conclude that it would apply to Texas if the alternative to the death sentence in a capital murder case here were life in prison without parole. Since that is not true under current Texas law, *Simmons,* in my opinion, is not applicable.

The Texas Legislature has established the procedure to be followed once an individual is convicted of capital murder. Tex.Code Crim. Proc.Art. 37.071 (as amended, effective for offenses committed on or after September 1, 1991). The Legislature has also determined that the jury in a capital case is *not* to be charged as to the law relating to parole and/or good time in any case in which the defendant has been convicted of a capital felony. Tex.Code Crim.Proc.Art. 37.07, § 4 (1994). Given this clear expression of legislative intent, it is my opinion that it would be inappropriate for this Court to substitute its own judgment and overrule Art. 37.07, § 4, absent clear direction from the Supreme Court that we must do so. In my opinion, *Simmons* is not that clear direction.

Subject to the comments above, I join the opinion of the Court but only concur with the disposition of point of error number nine.

CLINTON, Judge, dissenting.

Appellant argues in his ninth point of error that the trial court erred in failing to let him inform the jury, as per his explicit request, that if assessed a life sentence, he would be required by law to serve a minimum of fif-teen years confinement in the penitentiary before he would even be eligible to be paroled by the Board of Pardons and Paroles. The plurality rejects this contention on the following reasoning. First, the plurality cites the "policy" of this state, grounded in principles of separation of powers, to prohibit jury deliberation on parole in capital cases, and "not to officially inform jurors of the actual consequences of a life sentence." Op. at 849. Second, notwithstanding the opinion of the United States Supreme Court in *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the plurality concludes that the Due Process Clause of the Fourteenth Amendment does not require informing the jury as appellant requested in this cause, and thus does not trump our own state-constitutionally-based policy against it.

After careful consideration, I find I must disagree with the plurality in both its conclusions. First, I believe we have been mistaken over the last twenty years to conclude that principles of separation of powers somehow prohibit (we have never expressly explained how) informing jurors in a capital case that a capital defendant sentenced to life imprisonment must serve a certain minimal length of that sentence before he becomes eligible for parole. They do not. Second, that a capital defendant sentenced to serve a life sentence must actually serve a certain minimum length of that sentence before becoming eligible for parole seems to me to be "indisputably relevant" to the determination whether he will "commit criminal acts of violence that would constitute a continuing threat to society" under former Article 37.071(b)(2), V.A.C.C.P. See *Simmons,* supra, at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 142. Extrapolating from the principles announced in the plurality opinion in *Simmons,* the conclusion seems inescapable to me that failure to avail the jury of this "indisputably relevant" information violates due process—at least where, as here, there is evidence that by the time the defendant has served the statutory minimum penitentiary time, his potential "threat to society" at large

will be greatly reduced. In my view, then, state separation of powers does not prevent, and federal due process positively requires, at least upon request, that the jury be informed of, and allowed to consider for its relevance to future dangerousness, the minimum length of time a capital defendant sentenced to life must serve before becoming parole-eligible.

## I.

Appellant committed the instant offense on May 15, 1990. An accused convicted of committing a capital murder on that date is required by statute to serve a minimum of fifteen years in the penitentiary, exclusive of good time credits, before becoming eligible for parole. See former Article 42.18, § 8(b), V.A.C.C.P., prior to its amendment by Acts 1991, 72nd Leg., ch. 652, §§ 10 & 15(b), pp. 2396–97, eff. Sept. 1, 1991. This means that appellant would not even become eligible for release on parole until well into his upper thirties.

At the punishment phase of trial appellant called Dr. Fred Fason, a board certified psychiatrist, to testify. Fason had examined appellant prior to trial for purposes of determining his sanity at the time of the offense and his competency to stand trial. In the course of this examination Fason concluded that appellant was "suffering from antisocial, what is now referred to as antisocial reaction[,]" formerly known as "sociopathic disturbance." Fason elaborated that antisocial reaction:

"is characterized by … the rebelliousness, self-centeredness, concern for oneself and difficulties with the law of antisocial behavior. In essence, it's the person's mental problems manifested in their behavior rather than in their thinking or their feelings.

Q How does a person in effect become that way? Again for want of a better phrase, is this something that a person is born with or is it something that the person develops during an individual development as a human being?

A There are somewhat different theories. I will try to explain it to the best that I can. * * * [T]he first thing about the sociopathic personality disorder or the antisocial individual has to do with what occurs at relatively an early age of development. Most of us when we get to—those of us who have children, remember when our children were a year and a half or two years old. Before the age of two, children that are that age are prone to be very narcissistic. And what I mean by that I mean they view the world and their whole life as when they cry and vomit and mama appears and fees [sic] them. If they are cold, they cry and mama appears and covers them up, etcetera. Now, their views are prone to see the mother as kind of a light, the genie from Aladdin's lamp. And around the age of two and a half or somewhere in there the child becomes aware that mother looks after him because she loves him, not because she has to. And it's a whole new ball game. Mother with children experience this. They say that this is when the terrible twos become the terrific threes and the child understands now that Mother is looking after him not because he makes her do that but because she loves him and it's a whole new ball game.

Now, the narcissistic individual is left in a sense like the year and a half old baby that he feels entitled to whatever he wants. And people get started at this stage of development they become self-centered, they don't really are [sic] about other people. And this is a sense almost of the sociopath or psychopath. There is an additional factor that gets superimposed and without—and I hope I'm not being disruptive for the Court or the ladies and gentlemen of the jury. I will have to quote what goes on inside the mind of the psychopath to relieve the stress that others of us experience. And it is an attitude that is expressed by what people say to themselves in the phrase—and this is based upon the examination of hundreds of individuals who have fallen into the diagnostic category. Again if you will pardon the expression, it's fuck it, I don't care. And this is what the

individual says to himself about the things that are normally stressful to him. And in order to make it work he has to act like it and many individuals that, as with Mr. Smith when I asked him if he remembers when he started saying that to himself and he clearly remembered it. And it was a way of discounting. It's a way of avoiding shame. It's a way of avoiding the ordinary drive control that we use to control our impulses.

\* \* \* \* \* \*

The sociopathic personality at some point in the development not only is started at the narcissistic level but adopts as a life-style the phrase to himself that enables him to discount the rules. And if you say well, aren't you ashamed of that, you get that response. Are you concerned that it hurts that person, and again it's that same phrase. And this frees the sociopathic personality from having to struggle with conflicts that most of us struggle with in life. It comes out in their behavior.

Q Let me clarify that for myself. You used the term drive controls—

A Yes.

Q —that are in place for the normal individuals who interact with other people on a daily basis in our society; is that right?

A Yes.

Q Those drive controls would be shame?

A Yeah. The three drive controls that most of us use to control our impulses are, number one, shame. That is what it says about us. I might get an impulse to do something and it might be a natural impulse, as Freud said, but I might think I'm not that kind of person. I don't want to be the kind of person that would do something like that. And if I did that I would be ashamed of doing that and I wouldn't want to feel that way and that would keep me from acting on that impulse. Now, that's one.

The second one would be guilt. I don't like to feel guilty. I don't know about you but I don't think most normal people like to feel guilty about something. And I don't like to do things that make me feel guilty. \* \* \*

The third drive control that we normally use is concern about the consequences. \* \* \* So that you have those three types of drive control that people use to fit in this society.

Q All right. Go ahead. I'm sorry.

A Mr. Smith doesn't have those. He quit using those a long time ago.

Q And as I understand, that has been replaced, the concern for those three areas or drive controls have been basically either replaced or covered up with—again my apologies to the jury—the attitude of the phrase fuck it, I don't care?

A That is right. When his conscience started to speak to him years and years ago the little voice inside says you shouldn't do that. But he started saying that to his conscience so many years ago that he even quit listening to it and quit hearing it."

Asked what appellant's "prognosis" would be, Fason replied:

"... [Y]ou see a lot of people in their twenties with this diagnosis. Anyone in the criminal justice system who has been here a while sees an awful lot of people who are 18 to 29 that would fall into that category. When people get past the age of 30 you don't see that many in the criminal justice system. And past age 40 you rarely ever see someone with this diagnosis past the age of 40.

\* \* \* \* \* \*

... [Sociopaths] get into their late twenties or early thirties or sometimes mid-thirties and they start realizing they do care and telling themselves they don't care doesn't work anymore. And when it doesn't work anymore then they have to start changing their whole lifestyle.

... What happens to them when they get to their forties? Occasionally you will

see one but it is relatively rare or at least uncommon in comparison to the number of individuals that fall into this diagnostic category in their twenties.

When appellant next attempted to ask Dr. Fason how long appellant would be required to serve in the penitentiary before he would become eligible for parole, the State objected, and a lengthy bench conference ensued. Ultimately the trial court ruled that the answer to this question was inadmissible because it would invite jurors to disregard the conventional jury instruction charging them not to consider any action the Board of Pardons and Paroles might take on some future occasion. Dr. Fason was ultimately allowed to testify in response to questioning by appellant, however, that "the length of time that a person is locked up might be a factor in determining whether or not that person is a danger to this community[.]" [1]

Later, at the jury charge conference, appellant requested "that the parole instruction be withdrawn and that the defendant be permitted through counsel to instruct the jury and tell the jury as to the length of time the defendant in all probability will be forced to spend ... [t]hat it would be 15 years." This request was denied. The trial court instructed the jury:

"During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles Division of the Texas Department of Criminal Justice or of the Governor, or how long the defendant would be required to serve to satisfy a sentence of life imprisonment."

On one occasion during his final summation, appellant's counsel attempted an oblique rhetorical allusion to the fact that appellant would not be a danger to the general public by the time he might be paroled, *viz:* "I

assure you that by the time the bus from Texas Department of Corrections drops him off at the bus stop most of us won't be around any more." The State's objection to this argument was sustained, and the jury instructed to disregard it.

## II.

The plurality observes that the jury in a capital case may not "consider parole in any manner when considering whether a capital defendant should be sentenced to life or death." Op. at 849. It is true that we have consistently held that judicial consideration of parole in sentencing would be improper in capital as well as non-capital cases. We have said so as early as *Freeman v. State*, 556 S.W.2d 287, at 304 (Tex.Cr.App.1977), and as late as *Garcia v. State*, 887 S.W.2d 846, 860 (Tex.Cr.App.1994). As a general proposition this is undoubtedly correct. "The evil to be avoided is the consideration by the jury of parole in assessing punishment." *Rose v. State*, 752 S.W.2d 529, at 535 (Tex.Cr.App. 1987) (Opinion on original submission), citing *Clark v. State*, 643 S.W.2d 723, at 725 (Tex. Cr.App.1982).

In a capital case in Texas, however, the jury does not "assess punishment." See *Boyd v. State*, 811 S.W.2d 105, at 120 (Tex. Cr.App.1991). Indeed, as of the time of appellant's trial, capital juries did not even decide "whether a capital defendant should be sentenced to life or death." They simply answered special issues, questions of fact relating to the deliberateness with which the defendant acted to cause the death of the deceased, the probability he would be a continuing threat to society, and whether his killing of the deceased was a reasonable response to provocation, if any. See former Article 37.071(b), V.A.C.C.P. That the jury in a capital punishment proceeding might

---

**1.** Appellant also attempted to elicit from Dr. Fason that convicted capital murderers serving life sentences in maximum security units have not generally proven to be violent. Counsel's questions were inartful, however. The most he established was that Fason was "familiar with studies on that." Fason did not say whether he believed those studies were accurate. Nor did he have personal knowledge that capital murderers sentenced to life would necessarily serve those sentences in maximum security units. In short, counsel was less than successful in establishing appellant would not pose a threat of future violence to the prison "society" if given a life sentence.

consider the minimum length of time a capital defendant serving a life sentence must actually serve before becoming eligible for parole, relevant to assessing the probability of his future dangerousness, does not mean it is considering parole "in assessing punishment."

## A.

The Court has long held in non-capital cases that jury consideration of when the Board of Pardons and Paroles might release a convict on parole would constitute a judicial encroachment upon a manifestly executive function, in violation of Article II, § 1 of the Texas Constitution. This is surely correct. In *Sanders v. State*, 580 S.W.2d 349, at 351 (Tex.Cr.App.1978), we explained:

> "[i]t would be improper for punishment to be based on an expectation that clemency powers would be exercised, and it would be unconstitutional to attempt to delay exercise of the clemency powers or to avoid the possible granting of parole by increasing punishment in anticipation thereof."

See also *Rose v. State*, supra, at 532. It is for this reason that jury consideration of parole in a non-capital case is considered always to constitute jury misconduct under former Article 40.03(8), V.A.C.C.P., and now, Tex.R.App.Pro., Rule 30(b)(8). *Sanders v. State*, supra, at 352.

In 1985 the Legislature added Section 4 to Article 37.07, V.A.C.C.P. See Acts 1985, 69th Leg., ch. 576, § 1, p. 2195, eff. Sept. 1, 1985. This provision for the first time required trial courts to instruct juries in non-capital felony trials generally about the law of parole, but specifically that "[y]ou are not

to consider the manner in which the parole law may be applied to this particular defendant." Nevertheless, the statutory instruction did authorize the jury in some unspecified sense to "consider the existence of the parole law and good conduct time." We therefore declared § 4(a) of Article 37.07 unconstitutional, on the basis, *inter alia*, that it violated separation of powers under Article II, § 1, supra. *Rose v. State*, supra, at 535.

The voters of Texas approved an amendment to Article IV, § 11 of the Texas Constitution in 1989 that for the first time authorized the Legislature to enact "laws that require or permit courts to inform juries about the effect of ... eligibility for parole ... on the period of incarceration served by a defendant convicted of a criminal offense." See Acts 1989, 71st Leg., S.J.R. 4, § 1, p. 6414, approved Nov. 7, 1989. At the same time the Legislature reenacted Section 4 of Article 37.07, supra, thus reinstating the jury charge provisions we had struck down in *Rose*. See Acts 1989, 71st Leg., ch. 103, § 1, p. 442, effective upon approval of the constitutional amendment, Nov. 7, 1989. This Court later held that, *Rose* notwithstanding, a jury instruction given pursuant to the reenacted provision did not violate separation of powers. *Oakley v. State*, 830 S.W.2d 107, at 110 (Tex.Cr.App.1992).

By its terms, reenacted Article 37.07, § 4 expressly exempts capital cases from its operation. Thus, the Legislature has not expressly provided any law that permits or requires courts to inform juries of the effect of eligibility for parole on the period of incarceration that a capital defendant sentenced to life imprisonment must serve.[2] Article IV, § 11, supra. It may be argued accordingly

---

**2.** In his concurring opinion Judge Mansfield opines that by providing that the particular instructions in Article 37.07, § 4, are not to be given in capital cases, the Legislature has "also determined that the jury in a capital case is *not* to be charged as to the law relating to parole and/or good time in any case in which the defendant has been convicted of a capital felony." Op. at 857. The Legislature has made no such broad determination. Article 37.07 does not purport to cover punishment proceedings in capital cases. Such proceedings are governed by

Article 37.071, V.A.C.C.P. That provision neither expressly authorizes nor expressly prohibits informing a jury as to minimum parole eligibility. But subsection (a) of 37.071 does authorize the trial court to admit any evidence it "deems relevant to sentence." Minimum parole eligibility is "indisputably relevant" to the issue of future dangerousness. See Part IIC, *post*. Moreover, were we to construe Article 37.07, § 4 to prohibit informing a capital jury of minimum parole eligibility in any case in which the defendant is able to present evidence he will present a significantly

that, in the absence of such an express provision, the separation of powers principle of *Sanders* and *Rose* still prevails, preventing the trial court in a capital case from instructing the jury at punishment in any manner other than as the jury in this cause was in fact instructed, *viz:* that it may not consider any possible action of the Board of Pardons and Paroles or how long the defendant may actually have to serve to satisfy a life sentence.

This argument presupposes, however, that any jury instruction regarding parole in a capital case will violate separation of powers in the same way we perceived it would in *Sanders.* It presumes that a jury instruction about the parole law in a capital case will invite the jury to encroach upon the executive prerogative to grant parole in much the same way we feared that a jury so instructed in a non-capital case would. It seems to me, however, that that presumption merits greater scrutiny, and to that I now turn.

### B.

The body of caselaw culminating in *Sanders* has since been incorporated uncritically into our capital jurisprudence. Without stopping to ask whether, and if so to what extent, jury consideration of parole in the punishment phase of a capital case really would encroach upon the executive function, the Court has simply assumed that it would, and ruled accordingly. In *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979), for example, the defendant requested a jury instruction that explained the parole process, and function of the Board of Pardons and Paroles, and then admonished the jury "not to consider in their deliberations parole or whether [the defendant] might be paroled at some date in the future." *Id.,* at 478. In holding the trial did not abuse its discretion in failing to give the requested instruction, the Court first observed that "[t]he matter of parole or a defendant's release thereon is not a proper

consideration for a jury's deliberations on punishment." *Id.* Without explication, the Court then concluded: "This is also true in a capital case where the jury's task at the punishment stage is to answer the special issues." But is this necessarily so?

The earliest case in which a capital defendant expressly requested an instruction educating the jury as to the minimum time he would have to serve before becoming eligible for parole is *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985). There the defendant requested that the jury be instructed that:

> "you are not to consider how much of his sentence the defendant would be required to serve before being released on parole, if his punishment is assessed at life imprisonment. You are instructed, however, that under the law, a person who is serving a sentence of life imprisonment for the offense of capital murder may not be considered for release on parole until his actual calendar time served, without consideration of good conduct time, is twenty (20) years."

The trial court refused this instruction, and Franklin complained of it on appeal. This Court simply quoted the above language from *O'Bryan v. State*, supra, as if it were self-evidently dispositive of Franklin's contention, and overruled this ground of error. But *O'Bryan* did not purport to address the question whether a specific jury instruction on minimum parole eligibility might be appropriate insofar as it relates to the jury's resolution of the question whether the accused will probably constitute a continuing threat to society. With all due respect, the matter is not as simple as we thought in *Franklin.*

Likewise in *Andrade v. State*, 700 S.W.2d 585 (Tex.Cr.App.1985), the defendant argued the trial court erred in failing to instruct the jury that, if sentenced to life imprisonment, he would not become eligible for parole until serving at least twenty calendar years. This

---

reduced threat to society by then, it would operate to deprive him of his right to present a complete defense, in violation of due process.

See Part III, *post.* We should eschew potentially unconstitutional interpretations of a statute.

Court rejected this contention on authority of its earlier decision in *Williams v. State,* 668 S.W.2d 692 (Tex.Cr.App.1983). But in *Williams* the Court had a different question before it. There the defendant had objected to an instruction that was submitted to the jury cautioning it not to consider "how long this defendant would be required to serve to satisfy a sentence of life imprisonment." We held this instruction was not erroneous. That a capital jury may properly be admonished not to speculate as to the length of time a defendant will actually serve before he is paroled, however, does not necessarily mean that same jury may not also be told that he will have to serve a certain actual calendar time before he even becomes eligible for parole. The two instructions are not mutually exclusive, and propriety of the former does not logically establish impropriety of the latter. In my view this is a critical distinction, but one which has yet to be examined by the Court. *Williams* does not support the holding in *Andrade* any more than *O'Bryan* supported the holding in *Franklin.*

In *Knox v. State,* 744 S.W.2d 53 (Tex.Cr. App.1987), the defendant requested an instruction like the one we held Andrade was not entitled to. His request was denied. On appeal he invited this Court to "revisit" its holding in *Andrade* in view of the promulgation of Article 37.07, § 4, supra. We rightly observed that this provision on its face does not apply to capital cases. But Knox argued further that an instruction on the minimum period a capital convict sentenced to life imprisonment must serve before becoming eligible for parole "is necessary to guide the jury in answering the [future dangerousness] special issue." The Court's response to this argument is a puzzle. We said:

"[I]f it is clear that Article 37.07, § 4(a), does *not* apply to capital felonies, then it is also clear that jurors in capital cases should focus solely on the special issues submitted to them during the punishment phase. * * * Since jurors do not actually 'sentence' a defendant in Texas capital cases, their attention should be directed

only to answering the special issues without regard to the sentence that will ultimately be imposed."

*Id.,* at 64 (emphasis in the original). It is of course true that the jury should focus on resolving the special issues at the punishment phase of a capital case, since that is its only function at that juncture. It is equally true that the jury should answer the special issues without regard for the outcome. In short, the jury's role is simply to find facts. To point this out, however, was hardly sufficient to answer Knox's contention. He argued that his requested instruction should have been given *because* minimum parole eligibility *is* in fact relevant to the jury's fact-finding function insofar as it relates to the issue of future dangerousness. We did not agree or disagree with this contention. We apparently ignored it.

We were once again confronted with a claim, in *Jones v. State,* 843 S.W.2d 487, at 495 (Tex.Cr.App.1992), that a capital defendant should have been allowed to inform the jury that "he would be confined a minimum of 20 years" in the event he were sentenced to life imprisonment. Citing *O'Bryan* and its progeny for the familiar but not-dispositive proposition that parole in general is not a proper consideration for capital juries, we overruled Jones' claim. Once again we failed squarely to address the contention that knowledge of the minimum parole eligibility date would be relevant to the jury's resolution of the second special issue. In other cases we have rejected generic claims that capital juries should have been instructed on "the parole laws." E.g., *Stoker v. State,* 788 S.W.2d 1, at 16 (Tex.Cr.App.1989); *Elliott v. State,* 858 S.W.2d 478, at 489–490 (Tex.Cr. App.1993); *Garcia v. State,* supra. We have yet, however, to offer a coherent explanation of why the minimum period a capital convict who is assessed a life sentence must serve to become eligible for parole should not be relevant to the issue of future dangerousness. Nor have we explained precisely how an instruction on minimum parole eligibility would violate Article II, § 1, supra. In my view the information is relevant, and inform-

ing the jury of it would not violate separation of powers.

## C.

### Relevance

Evidence is relevant, under Tex.R.Cr. Evid., Rule 401, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Moreover, "[a]ll relevant evidence is admissible," except as otherwise provided by, *inter alia*, the state constitution. Tex.R.Cr.Evid., Rule 402. If the fact that appellant must serve at least fifteen years of a life sentence has any tendency to make more or less probable that he will commit future acts of violence so as to constitute a continuing threat to society, then that fact cannot be excluded from the jury's consideration, at least not on the basis that it lacks relevance.

Is minimum parole eligibility relevant in this sense? It seems to me that, at least in combination with other evidence, it often is. We have consistently held that "society" is to be understood in its common acceptation in ordinary English, and that as such, its meaning is not limited either to the "society" existing outside the walls of the Texas Department of Criminal Justice, Institutional Division, or to that "society" that exists within those walls. We have construed "society" to embrace both. See, e.g., *Sterling v. State*, 830 S.W.2d 114, at 120, n. 5 (Tex.Cr.App. 1992); *Caldwell v. State*, 818 S.W.2d 790, at 798–99 (Tex.Cr.App.1991); *Boyd v. State*, supra, at 118, n. 12; *Rougeau v. State*, 738 S.W.2d 651, at 660 (Tex.Cr.App.1987). In predicting "the fact of consequence," *viz*: whether a particular capital defendant will constitute a continuing threat to "society," it would undoubtedly aid the jury to know which aspect of society he will be exposed to, and when.

We often see evidence, for example, that a capital defendant presents a much greater threat to the "society" at large than to the prison population. Sometimes, as in the instant case, there is evidence that in time the accused will not present much of a threat to either the prison population or the general public. See also, e.g., *Matson v. State*, 819 S.W.2d 839 (Tex.Cr.App.1991). In combination with this kind of evidence, knowing that the accused, if assessed a life sentence, will spend at least a certain minimum period of time incarcerated helps the jury to decide the probability that he will be a continuing threat to society, because it helps the jurors identify where he will be. Thus they can tell what portion of society may or may not be at risk. If the defendant must spend at least fifteen years in prison to satisfy a capital sentence of life imprisonment, the jury must decide the probability he will pose a threat to the prison population for at least that long, and then, the probability he will threaten the general public after that. Moreover, if there is evidence, as here, that in fifteen years the accused will not constitute a significant danger either inside or outside prison walls, the fact that he will be incarcerated until then tends to minimize the possibility of his ever constituting a threat, at least to the public at large. In short, appellant's location, to the extent it can be foretold with relative certainty, is an evidentiary fact from which the elemental fact, whether he will be a continuing threat to "society," may be, in part, derived. This evidentiary fact is "indisputably relevant" even under the provisions of our rules of criminal evidence.

### Separation of Powers

Unless imparting this relevant evidentiary fact to the jury would violate separation of powers under *Sanders*, then, it ought to be accessible to the factfinder. In my view, the danger we noted in *Sanders* simply does not pertain to the question whether a capital jury should be informed how long a defendant who is sentenced to life imprisonment will have to serve before he becomes eligible for parole. Jury consideration of the minimum parole eligibility date as it relates to the issue of future dangerousness is manifestly a judicial function. It does not encroach upon the executive prerogative at all.

At the punishment phase of a non-capital criminal case, the jury's function is not, as in a capital case, to make discrete findings of fact. Instead, the jury decides what term of punishment is appropriate within the statutorily prescribed range. "Deciding what punishment to assess is a normative process, not intrinsically factbound." *Murphy v. State*, 777 S.W.2d 44, at 63 (Tex.Cr.App.1988) (Plurality opinion on State's motion for rehearing). There is always the danger in a non-capital punishment proceeding that the jury, cognizant of the parole law, will abuse its wide discretion to decide what punishment is appropriate by imposing a sentence that takes the possibility of parole into account, and tries to adjust for it.[3] This encroaches unconstitutionally upon the executive function in that it attempts to anticipate and circumscribe exercise of the executive authority to grant parole. *Sanders v. State*, supra, at 351.

In a capital punishment proceeding the jury's role is more limited. The capital jury does not "assess punishment." Rather, it determines the existence of discrete facts, such as the probability the accused will commit criminal acts of violence that would constitute a continuing threat to society. Punishment is assessed according to the jury's resolution of these fact issues. See former Article 37.071(e), V.A.C.C.P. Capital jurors have no occasion to anticipate and circumscribe the executive parole authority. Because they do not "assess punishment" at all,

they cannot assess death instead of a life sentence in order to prevent the eventual release of the accused on parole. Capital jurors just find facts. They weigh relevant information and answer special issues accordingly. Thus, when capital jurors consider the minimum parole eligibility date of a capital defendant serving a life sentence, they only use that information to more accurately gauge the probability of his future dangerousness—manifestly a judicial function. They do not try to predict when he will actually be released on parole.[4] Indeed, they do not pretermit, second-guess or otherwise interfere with any power or prerogative of the executive branch in any way. It therefore cannot be said that they violate the principle of separation of powers articulated in *Sanders*.

### D.

An instruction on minimum parole eligibility in a capital case does not offend Article II, § 1, supra. Our handful of cases tacitly assuming that it does, such as *Franklin, Andrade*, and *Knox*, all supra, ought to be disapproved. Moreover, that Article 37.07, § 4, supra, does not expressly authorize a parole instruction in a capital case does not mean a capital jury cannot be informed as to minimum parole eligibility. That provision, in tandem with the amendment to Article IV, § 11, supra, was meant to authorize parole instructions notwithstanding any violation of separation of powers. Because informing a

---

**3.** Of course, under current Article 37.07, § 4(a), supra, this would only be an abuse of discretion if the jury tried to anticipate "the manner in which the parole law may be applied to [the] particular defendant" on trial. It is not now an abuse of discretion for the jury generally to "consider the existence of the parole law."

**4.** In any case, it is not clear to me that jury consideration of when a capital defendant might actually be paroled would itself violate separation of powers. The actual date a life-sentenced inmate is paroled is undoubtedly relevant to the future dangerousness issue in the same way and to at least the same extent that minimum parole eligibility is. A capital punishment jury considering actual parole date would thus be simply performing a judicial factfinding role, and not attempting to circumscribe an executive func-

tion. The difference is, of course, that actual parole date is contingent upon future facts and actions of the Board of Pardons and Paroles, and cannot be determined with certainty as can the minimum parole eligibility date. That the actual parole date is speculative does not mean it is not relevant, however, or that jury consideration of same would violate separation of powers. The speculativeness of the enterprise might be reason to hold that evidence of actual parole date, while relevant and not violative of separation of powers, is nevertheless excludable because it is more prejudicial than probative. See Tex.R.Cr.Evid., Rule 403. We need not reach these issues in the present case, however, since appellant only requested that the jury be informed of the minimum parole eligibility date.

capital jury on minimum parole eligibility does not violate separation of powers in the first instance, express legislative authorization for an instruction, pursuant to Article IV, § 11, supra, is unnecessary.

Thus, there is no constitutional or statutory impediment in Texas to informing capital jurors of the minimum period of time an accused sentenced to life imprisonment for a capital offense must serve to become eligible for parole.[5] There is no real "policy" against it, as the plurality perceives. Minimum parole eligibility is certainly relevant, under Rules 401 and 402 of the Rules of Criminal Evidence, and any evidence or instruction informing the jury of it ought to be permitted for that simple reason, if no other. Moreover, federal due process may require it, under *Simmons v. South Carolina,* supra. If so, there is no conflict with Texas law.

### III.

Appellant contends there is in fact such a federal due process requirement. It is less than evident, reading *Simmons* on its face, that due process requires informing a capital jury of the statutory minimum period of service on a life sentence before parole becomes available under the law. On its face *Simmons* seems only to require informing the jury that parole is unavailable whenever that is true as a matter of state law and the issue of future dangerousness has been injected

into the case. We have no provision for life-*sans*-parole in Texas. Nevertheless, logically extending the due process principle announced in *Simmons* leads me inexorably to conclude that the trial court erred in failing to allow appellant to inform the jury as he requested to do in this case.

Speaking for a plurality in *Simmons,* Justice Blackmun announced at the outset:

> "that where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."

—— U.S. at ——, 114 S.Ct. at 2190, 129 L.Ed.2d at 138. Because our legislature has made future dangerousness one of the statutory criteria for imposition of the death penalty, it is "at issue" in every capital punishment proceeding in which the State seeks a sentence of death. Thus, it appears that the first prong of the *Simmons* due process test is always met in Texas. However, under Texas law capital murder defendants sentenced to life imprisonment are not ineligible for parole. Justice O'Connor, in her concurring opinion, strongly suggests that the due process principle extends only when parole is not an available alternative.[6] Several jurisdictions have already interpreted *Simmons* to be limited in this fashion.[7] In the instant case, without any analysis, the plurality does

---

**5.** In *Rose v. State,* supra, we also held that a jury instruction authorizing consideration of the existence of parole in a non-capital case violates due course of law under Article I, §§ 13 and 19 of the Texas Constitution. We found intolerable "the risk that punishment will be based on extraneous considerations." *Id.,* at 537. No such risk exists, however, when jurors in a capital punishment proceeding are informed of the minimum number of years a life-sentenced capital convict must serve to become eligible for parole. Minimum parole eligibility is not an "extraneous" consideration in determining the issue of future dangerousness. Indeed, as I hope I have demonstrated in Part IIC, *ante,* it is "indisputably relevant" to that determination. For this reason, informing the jury as appellant requested in this cause does not violate due course of law any more than it violates separation of powers.

**6.** Justice O'Connor opined that:

> "[D]espite our general deference to state decisions regarding what the jury should be told about sentencing, I agree that due process requires that the defendant be allowed to [bring his parole ineligibility to the jury's attention] in cases in which the only available alternative sentence to death is life imprisonment without possibility of parole and the prosecution argues that the defendant will pose a threat to society in the future."

—— U.S. at ——, 114 S.Ct. at 2201, 129 L.Ed.2d at 151.

**7.** E.g., *Allridge v. Scott,* 41 F.3d 213 (CA5 1994); *State v. Price,* 337 N.C. 756, 448 S.E.2d 827 (1994); *Ramdass v. Commonwealth,* 248 Va. 518, 450 S.E.2d 360 (1994).

too. Op. at ——. On that basis the plurality concludes that the holding in *Simmons* has no application in Texas. In my view, however, the principle of *Simmons* transcends its factual context, and does apply in Texas in some instances.

### A.

Future dangerousness is not automatically at issue in South Carolina as it is in Texas. In *Simmons*, however, the prosecutor had expressly invited the jury in his closing argument to factor the defendant's future dangerousness into its decision whether to assess life or death. *Id.*, —— U.S. at ——, 114 S.Ct. at 2190–2191, 129 L.Ed.2d at 139.[8] The defendant had proffered evidence that he was only a threat to elderly women, a class of people he would not encounter in the penitentiary. *Id.*, —— U.S. at ——, 114 S.Ct. at 2191, 129 L.Ed.2d at 139. Out of the jury's presence he presented public-opinion evidence that jury-eligible adults in South Carolina largely assumed a life-sentenced murderer would be paroled at some point. *Id.*, —— U.S. at ——, 114 S.Ct. at 2191, 129 L.Ed.2d at 140. Nevertheless, Simmons' counsel was prevented from voir diring the jury panel on the issue of parole eligibility. Arguing that the public misperception about parole eligibility needed to be dispelled in his cause, Simmons requested jury instructions that would inform the jury of the law. The trial court refused, instructing the jury instead that it should disregard parole and parole eligibility, and that it should construe "life imprisonment" according to its ordinary meaning. *Id.*, —— U.S. at ——, 114 S.Ct. at 2192, 129 L.Ed.2d at 140.

In holding that the trial court violated due process in failing to inform the jury of the unavailability of parole, the plurality in *Simmons* observed:

> "In assessing future dangerousness, the actual duration of the defendant's prison

sentence is indisputably relevant. Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled with our well established precedents interpreting the Due Process Clause."

*Id.*, —— U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 142–43. Accordingly, the plurality held that denying the jury "a straight answer" regarding availability of parole impaired Simmons' ability to "deny or explain" the State's showing of his future dangerousness, and thereby violated his right to due process of law. *Id.*, —— U.S. at ——, 114 S.Ct. at 2195 & 2196, 129 L.Ed.2d at 144 & 145–46, quoting *Gardner v. Florida*, 430 U.S. 349, at 362, 97 S.Ct. 1197, at 1207, 51 L.Ed.2d 393, at 404–405 (1977).

*Simmons* thus stands for the proposition that whenever future dangerousness is in issue in a capital punishment proceeding "the actual duration of the defendant's prison sentence is indisputably relevant." *Id.*, —— U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 142. When parole is not an option at all, that fact is relevant in the sense that it tells the jurors where the capital defendant will spend the rest of his natural life, so that they may confine their deliberations on future dangerousness to the risk he poses to prison society. It tends to make less probable that he will be a continuing threat at least to the general public. Moreover, to the extent the capital

---

8. The plurality contends that the prosecutor in *Simmons* "urged the jury to vote for the death penalty because Simmons would be released from prison." Op. at 851 & n. 19. Literally this is not true, at least as far as the plurality opinion in *Simmons* discloses. *Id.*, —— U.S. at ——, 114 S.Ct. at 2190, 129 L.Ed.2d at 139. Although the

prosecutor's having raised future dangerousness no doubt led the jury to ponder whether the defendant would be released from prison, and if so when, the plurality's disposition in *Simmons* is not contingent on the fact that the prosecutor literally invited them to (if he did).

defendant can show, as could Simmons himself, that he does not pose a threat even to the inmate population, unavailability of parole tends to make less probable that he will be a threat to any facet of society at all.

This logic is not limited to the no-parole situation. On the contrary, it extends to any evidence of "the actual duration of the defendant's prison sentence." How much of his life the capital defendant will spend in prison is relevant to the future dangerousness determination in exactly the same way as the fact that he will spend the rest of his life there. It informs the jurors where the capital defendant will be so that they can tell what "society" may or may not be at risk. See Part IIC, *ante*. If you add other evidence that by the time the capital defendant becomes eligible for parole he will not likely pose a threat to any facet of society, then the fact that he must serve a specific minimum period of time in prison before he can be paroled takes on practically the same significance as no parole eligibility at all. It tends to show he will never be a threat to the public at large. Therefore, if failing to inform the jury of the "indisputably relevant" fact that a capital defendant can never be paroled violates due process, as the plurality opinion in *Simmons* establishes, then so, at least under some circumstances, does failing to inform the jury of the minimum parole eligibility date.[9] We should so hold.

### B.

The plurality mentions *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), almost in passing. Op. at 849. The suggestion seems to be that when a state makes parole available to a capital defendant sentenced to life imprisonment, the Supreme Court will not interfere with the state's decision whether to inform juries of the parole law. Admittedly, in *Simmons* the plurality itself did observe:

> "that *Ramos* stands for the broad proposition that we generally will defer to a State's determination as to what a jury should and should not be told about sentencing. In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole. States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like, should be kept from the jury in order to provide 'greater protection in [the States'] criminal justice system than the Federal Constitution requires.' [*California v. Ramos*], 463 U.S., at 1014, 103 S.Ct., at 3460."

As I read them, however, neither *Ramos* itself, nor the plurality's discussion of *Ramos* in *Simmons,* justifies failing to inform a capital jury of minimum parole eligibility.

In the first place, we have never "reasonably" concluded in Texas that information about parole eligibility *should* be kept from capital juries, at least not in order to "provide greater protection than the Federal Constitution requires." We have basically assumed that jury consideration of parole in general would violate separation of powers, even in a capital case, and is therefore prohibited. That assumption does not "protect" a capital defendant at all, much less does it provide greater protection than the Federal Constitution. Quite the contrary, it insulates the jury from information that is "indisputably relevant" to rebut the State's evidence

9. In *Matson v. State,* 819 S.W.2d 839 (Tex.Cr. App.1991), we held the trial court violated the Eighth Amendment in failing to admit the defendant's proffered evidence that recidivism rates are "extremely low" for inmates who serve long sentences their first time through the prison system. Absent some evidence that the capital defendant on trial will in fact be required to serve a relatively lengthy period of time incarcerated before he may be released, this evidence would serve no practical mitigating purpose *vis -a -vis* the special issues. If our holding in *Matson* is to make any sense at all, it is necessary also to inform the jury how long the accused will actually be imprisoned—or at least the minimum period we know he will be required by law to be imprisoned.

on the issue of future dangerousness. In any event, the assumption itself is incorrect. It is precisely *because* information about minimum parole eligibility *is* relevant to the future dangerousness determination that giving it to the jury does *not* violate separation of powers. See Part IIC, *ante*.[10] We have yet to offer any principled reason for keeping information about parole from a capital sentencing jury in Texas.

Second, and more importantly, today's plurality cannot fairly plead "speculativeness" to argue that informing a capital jury about minimum parole eligibility does not fall within the *Simmons* due process requirement. There is nothing remotely speculative about the fact that, if sentenced to life imprisonment, appellant would have to serve a minimum of fifteen years before becoming eligible for parole. See former Article 42.18, § 8(b), supra. Nor is there anything speculative about "how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty." Jurors in Texas do not decide whether to impose a life or death sentence. They answer special issues. That we can even say that minimum parole eligibility is "indisputably relevant" to the jury's determination of the future dangerousness issue means we know precisely "how" the jurors will consider that fact. They consider it to the extent, and only to the extent, that it militates either for or against a finding of future dangerousness. When it militates against a finding of future dangerousness, *Simmons* dictates that the jury hear it, *Ramos* notwithstanding.[11]

### C.

Finally, the plurality maintains that other procedural safeguards during the course of

trial prevented the parties from placing parole eligibility in issue, and therefore appellant did not need to present the fact of minimum parole eligibility to "deny or explain" anything. Op at 850–853. Texas law precludes either party from broaching the subject of parole during voir dire, except to ascertain whether veniremen can follow instructions requiring jurors to ignore parole. It also prevents prosecutors from arguing expressly that the jury should answer special issues affirmatively in order to obviate the possibility a capital defendant may ever be paroled. Under Texas law the jury is positively instructed, as in this case, to disregard parole in its deliberations. Protections against jury misconduct guarantee that if his jury nevertheless does consider parole, the capital defendant may obtain a new trial. These legal safeguards, the plurality assures us, are sufficient to keep eligibility for parole from entering into the jury's deliberations, and nothing is injected into the sentencer's field of vision that the capital defendant is prevented from addressing. The plurality relies in large measure upon *Gardner v. Florida*, supra.

The plurality fails to acknowledge that the principle of due process articulated in *Gardner* was later expanded in *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), and in *Simmons* itself. It is true that the holding in *Gardner* itself extends no further than its facts. In *Gardner* the sentencing judge rejected an advisory jury's recommendation of life imprisonment in favor of a sentence of death based in part upon a confidential presentence report that the defendant was given no chance to review. A plurality of the Supreme Court held that due process was violated because the defendant was afforded no chance to

---

10. Nor does informing the jury of minimum parole eligibility in a capital case violate due course of law. See n. 5, *ante*.

11. It may well be the case that under *Ramos* we could prevent capital jurors from trying to predict when a life-sentenced defendant will actually be paroled. The actual parole date *is*, of course, purely speculative. Therefore, an instruction to capital jurors not to try to predict that date would not seem to violate due process, *Simmons*

notwithstanding. This is not to say that the actual parole date is not relevant to the issue of future dangerousness—undoubtedly it *is*. See n. 4, *ante*. And while *Ramos* suggests that we *could* prohibit jury consideration of when a capital defendant sentenced to life imprisonment might actually be paroled consistent with due process, we have yet to articulate a good reason why we *should*. See Part II, *ante*.

"deny or explain" the contents of the report, and hence no chance to participate meaningfully in the adversarial process by which Florida decides whether to impose a life or death sentence. *Id.,* 430 U.S. at 360 & 362, 97 S.Ct. at 1206 & 1207, 51 L.Ed.2d at 403 & 404. But the principle in *Gardner* has since been extended beyond its factual context. In *Skipper v. South Carolina,* supra, the majority observed:

> "Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only [the Eighth Amendment] that requires *that the defendant be afforded an opportunity to introduce evidence on this point;* it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.' *Gardner v. Florida,* [supra]."

*Id.,* 476 U.S. at 5, n. 1, 106 S.Ct. at 1671, n. 1, 90 L.Ed.2d at 7, n. 1 (emphasis added).

On the strength of this passage from *Skipper,* the plurality in *Simmons* concluded that any time future dangerousness is put in issue, the defendant must be allowed to rebut with information that he can never be paroled, so that whatever risk he poses is limited to the prison population. —— U.S. at ——, 114 S.Ct. at 2194, 2194–2195 & n. 5, 129 L.Ed.2d at 142–143, 143–144 & n. 5.[12] Justice O'Connor's concurring opinion agreed with the plurality that simply placing future dangerousness in issue is enough to trigger the due process requirement. *Id.,* —— U.S. at ——, 114 S.Ct. at 2200–2201, 129 L.Ed.2d at 150–151. One of Justice Scalia's principal

complaints in dissent was that seven members of the Court had unduly imposed "a rule at least as sweeping as this: that the Due Process Clause overrides state law limiting the admissibility of information concerning parole *whenever* the prosecution argues future dangerousness." *Id.,* —— U.S. at ——, 114 S.Ct. at 2203, 129 L.Ed.2d at 154 (emphasis in the original). In Texas, of course, the prosecution always argues future dangerousness. If it is correct, therefore, that the *Simmons* principle extends also to informing the jury in some cases about minimum parole eligibility, see Part IIIA, *ante,* the plurality cannot escape that principle by reverting to the earlier decision in *Gardner.* For under *Simmons,* minimum parole eligibility may serve, together with other evidence, to "deny or explain" the State's case for future dangerousness in every capital punishment proceeding in Texas.

Moreover, it does not satisfy *Simmons* to implement state procedures designed to insulate the jury entirely from any consideration of parole. Due process requires that a capital defendant be afforded "a meaningful opportunity to present a complete defense." *Id.,* —— U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 143, quoting *Crane v. Kentucky,* 476 U.S. 683, at 690, 106 S.Ct. 2142, at 2146, 90 L.Ed.2d 636, at 645 (1986). Preventing either side from broaching the subject of minimum parole eligibility when that fact is "indisputably relevant" to rebut the State's evidence of future dangerousness denies a capital defendant that opportunity. *Simmons,* supra, —— U.S. at ——, 114 S.Ct. at 2198, 129 L.Ed.2d at 147.[13] This denial might be constitutionally acceptable if it

---

**12.** The plurality in *Simmons* also alluded to two other Supreme Court cases in support of the broader proposition that due process guarantees defendants "a meaningful opportunity to present a complete defense." *Id.,* —— U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 143, quoting *Crane v. Kentucky,* 476 U.S. 683, at 690, 106 S.Ct. 2142, at 2146, 90 L.Ed.2d 636, at 645 (1986). See also, *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

**13.** In deciding whether the trial court's instruction in *Simmons* had been adequate to protect the defendant's due process rights, the plurality observed:

> "[E]ven if the trial court's instruction successfully prevented the jury from considering parole, petitioner's due process rights were still not honored. Because petitioner's future dangerousness was at issue, he was entitled to inform the jury of his parole ineligibility. An instruction directing the jury not to consider the defendant's likely conduct in prison would not have satisfied due process in *Skipper,* supra, and, for the same reasons, the instructions issued by the trial court in this case does not satisfy due process."

*Id.,* —— U.S. at ——, 114 S.Ct. at 2198, 129 L.Ed.2d at 147.

somehow served to enhance the overall fairness of the proceeding or to heighten the reliability of the jury's resolution of the special issues. See *Crane v. Kentucky*, supra, 476 U.S. at 690, 106 S.Ct. at 2146, 90 L.Ed.2d at 644. But as I have labored to show in the balance of this opinion, it does not. The plurality errs to conclude that when procedural steps are taken to prevent a capital jury from considering parole for any purpose, the defendant's due process rights as defined by *Simmons* have been preserved.

### IV.

Turning to the instant cause, I am compelled to conclude that appellant was denied due process under *Simmons*. Dr. Fason testified that appellant was a sociopath, and that the likelihood of recidivism for sociopaths by the time they reach their thirties is low, and by the age of forty, even lower. Compare *Matson v. State*, supra. Had it been informed that by law appellant was not even eligible for parole on a life sentence until serving fifteen years, by which time he would be well into his upper thirties, the jury would have been justified in concluding that his threat to the public at large was insignificant.[14] Without that information, the jury was probably left wondering exactly what the relevance of Dr. Fason's testimony was. See n. 9, *ante*. Indeed, without that information, but given Dr. Fason's testimony, the jury might have been tempted to disregard the trial court's instruction not to consider parole for any purpose, and engaged in the speculative enterprise of trying to guess when appellant would become eligible for parole. Sure-

ly it is preferable to inform capital jurors accurately on the law of parole eligibility.

For the reasons I have given in Part III, *ante*, I conclude that due process requires that a capital defendant be allowed, on request, to inform the jury on the law of minimum parole eligibility, at least whenever there is other evidence, as in this case, to indicate he may not constitute a continuing threat to society by the time he is parole-eligible. Nothing in the law of Texas should be construed to stand in the way. Part II, *ante*. Accordingly, the trial court erred in failing to allow appellant to inform the jury as he requested.

The Supreme Court did not indicate whether *Simmons* error is subject to a constitutional harmless error analysis. See *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The *Simmons* plurality simply reversed the cause and remanded it to South Carolina for unspecified further proceedings. *Simmons*, supra, —— U.S. at ——, 114 S.Ct. at 2198, 129 L.Ed.2d at 147. Assuming *Simmons* error is subject to a harm analysis, I cannot say to a level of confidence beyond a reasonable doubt that it was harmless in this case. Had the jury in appellant's trial been informed that he could not become eligible for parole for fifteen years, they might well have considered that information, together with Dr. Fason's testimony, sufficient to justify a negative answer to the special issue whether he would commit criminal acts of violence that would constitute a continuing threat to society.

Accordingly, I would vacate the trial court's judgment in this cause and remand the cause for a new punishment proceeding.[15]

---

14. It does not matter that appellant was unable to show he would not be a threat to prison society. See n. 1, *ante*. That the State can argue appellant may pose a danger to the prison population does not vitiate the relevance of other evidence that in time he will not pose a danger to anyone. As long as evidence has a tendency to show appellant will not pose a threat to some facet of society, due process requires that appellant be allowed to present it. *Simmons*, supra, —— U.S. at ——, 114 S.Ct. at 2194–2195, n. 5, 129 L.Ed.2d at 143–144, n. 5.

15. The offense was committed in May of 1990. Because the trial court committed "error affecting punishment only," we remand the cause for a new punishment hearing only. See Articles 44.251 and 44.29(c), V.A.C.C.P., as amended by Acts 1993, 73rd Leg., ch. 781, § 5, p. 3059, eff. Aug. 30, 1993, which made fully retroactive the amendments in Acts 1991, 72nd Leg., ch. 838, § 2, p. 2900, eff. Sept. 1, 1991, notwithstanding § 5(a) of the 1991 amendment, which had originally made § 2 applicable only to offenses committed after September 1, 1991.

Because the plurality does not, I respectfully dissent.[16]

OVERSTREET, J., joins this opinion.

MALONEY, Judge, dissenting.

In his eleventh point of error, appellant claims that the trial court erred in refusing his jury instruction on the statutory minimum period of time a capital defendant sentenced to life must serve before becoming eligible for parole in violation of the cruel and unusual punishment provision of the Eighth and Fourteenth Amendments to the United States Constitution. Appellant argues that in considering the special issue on future dangerousness,[1] the jury should have been instructed that if appellant was given a life sentence, he would not be eligible for parole for a period of 15 years.[2] Appellant objected to the trial court's punishment instruction admonishing the jury that it could not consider the minimum time appellant would have to serve before becoming eligible for parole.[3] Because the plurality holds that the trial judge's refusal of appellant's instruction did not violate the Eighth and Fourteenth Amendments, I dissent.

## I. Relevant Evidence and Discussion

During the punishment phase, Dr. Fason, a psychiatrist, testified on appellant's behalf

16. Because I would remand for a new punishment hearing, I need not decide whether appellant's other arguments claiming error affecting punishment only are meritorious. I must comment briefly, however, on the plurality's disposition of appellant's sixteenth point of error. Op. at 842–843. The plurality acknowledges that the trial court should not have sustained the particular objection that the State leveled at trial to appellant's proffered evidence. Nevertheless, the plurality holds there was no error because the trial court could have ruled (though manifestly it did not) that the probative value of appellant's proffered evidence was substantially outweighed by the danger of unfair prejudice, under Tex. R.Cr.Evid., Rule 403. There are so many problems with this disposition, one hardly knows where to begin. I will limit myself to two complaints. First, I would have thought it clear after *Montgomery v. State*, 810 S.W.2d 372 (Tex.Cr. App.1991) (Opinion on rehearing on Court's own motion), that it is the trial court's job to decide in the first instance whether relevant evidence is nevertheless inadmissible under Rule 403, subject only to appellate review for abuse of discretion. Here this Court makes that determination for the first time on appeal. This brings me to a second complaint. The plurality justifies its disposition under the rubric, "if the trial court's decision was correct on any theory of law applicable to the case...." Op. at 843. Since the State made no Rule 403 objection, I do not see how the theory that appellant's evidence was more-prejudicial-than-probative is "applicable to the case." What the plurality is really saying, it seems to me, is that ordinary notions of procedural default, as codified in Tex.R.App.Pro., Rule 52(a), do not apply to the State. The State need not object at trial or make the same objection on appeal that it did at trial in order to prevail on appeal. The plurality is willing enough to declare appellant's own arguments on appeal to have been procedurally barred. See, just as a convenient example, the plurality's disposition of appellant's very next point of error, point seventeen. Op. at 844. This is a particularly unsightly juxtaposition, and one that does not speak well of the evenhandedness of our supposedly adversarial criminal justice system. As for the plurality's disposition of appellant's eighteenth point of error, Op. at 853–855, complaining of the trial court's tardy correction of its instructions to the jury at the punishment phase, I am *dubitante*.

1. The following issue was proffered to the jury: "Is there a probability that the defendant, Robert Smith, would commit criminal acts of violence that would constitute a continuing threat to society?" Tex.Code Crim.Proc.Ann. art. 37.071.

2. Appellant's counsel requested a parole charge informing the jury that if appellant received life in prison, he would not be eligible for parole under any circumstances until he had served at least fifteen calendar years in prison. At the time of appellant's trial, Tex.Code Crim.Proc. Ann. article 42.18 § 8(b)(2) provided that a prisoner serving a life sentence for capital murder was not eligible for release on parole until his actual calendar time served, without consideration of good conduct time, equaled one-fourth of the maximum sentence or fifteen calendar years. Now, Article 42.18 § 8(b)(2) provides that a prisoner who is sentenced to life imprisonment for a capital offense must serve forty years, without consideration of good conduct time, before he is eligible for parole. Acts 1993 73rd Leg., Ch. 900 § 6.01.

3. The judge instructed the jury:

 During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or of the Governor, or how long the defendant would be required to serve to satisfy a sentence of life imprisonment.

that he had diagnosed appellant as suffering from "antisocial reaction." He explained that antisocial reaction is a sociopathic personality disorder characterized by "rebelliousness against the rules of society, difficulties in conforming to common social standard and self-destructiveness and behavior patterns."

Dr. Fason stated that appellant does not have the normal types of "drive controls" that people use to function in this society. He testified that appellant lacks the "drive controls" of shame, guilt, and concern for consequences; instead appellant maintains the attitude "Fuck it, I don't care." Dr. Fason offered his opinion that appellant "is not the kind of individual that has been pondering very much of anything very carefully since he decided that he didn't care, which was a long, long time ago.... [T]hat's why he's always in trouble."

When asked about the prognosis of individuals diagnosed with antisocial reaction, Dr. Fason replied:

[Y]ou see alot [sic] of people in their twenties with this diagnosis. Anyone in the criminal justice system who has been here a while [sic] sees an awful lot of people who are 18 to 29 that would fall into that category. When people get past the age of 30, you don't see that many in the criminal justice system. And past age 40 you rarely ever see someone with this diagnosis past the age of 40.

\* \* \* \* \* \*

Something happens to affect those individuals as they get into their thirties.... They get into their late twenties or early thirties or sometimes mid-thirties and they start realizing they do care and telling themselves they don't care doesn't work anymore. And when it doesn't work anymore they have to start changing their whole life-style [sic].

Dr. Fason agreed with counsel for appellant that there is a diminishing number of individuals in the criminal justice system with psychopathic or personality disorders from age forty on.[4] He later agreed with the trial court that persons suffering from antisocial reaction are much less likely to engage in crimes of violence once they reach the age of forty. On redirect, Dr. Fason observed that "there may be circumstances that arise after [a] person [convicted of capital murder] is incarcerated for life in the penitentiary that may remove that potential threat...." He agreed with appellant's statement that the length of time a person is locked up is a factor in determining whether a person is a danger to the community.

Appellant argues that in order to give mitigating effect to Dr. Fason's testimony, the jury should have been instructed on the minimum amount of time appellant would have to serve before becoming eligible for parole. During an extensive discussion with counsel outside the presence of the jury, the trial court noted that in the absence of evidence like Dr. Fason's, a jury could likely follow instructions not to consider parole, how long a defendant would be required to serve, or action by the Board of Pardons and Parole. However, the court stated, "By throwing evidence in like Mr. Parnham is suggesting [Dr. Fason's testimony], that might sort of pull the switch and cause them to talk about and consider those things." Later in the discussion, the trial court suggested that juror misunderstanding could result:

[Y]ou may have these people sitting here thinking he's going to spend life up there [in prison] and be up there for life. I don't know. But then somebody may say he would be on the streets in 15 years, he will be back out there for shorter than 15 years so maybe we should just go ahead and answer these issues yes. And that may be inappropriate.... [P]ractically every juror talks about the leniency of Texas laws dealing with parole. And it's a very troublesome area.

\* \* \* \* \* \*

I obviously think they [the jurors] are going to read between the lines in this

4. Appellant will be in his late thirties when he becomes *eligible* for parole.

instruction and [are] going to understand that this instruction [not to consider the action of the Board of Pardons and Parole] wouldn't be there ... [unless] Mr. Smith will at some time in his lifetime, if he gets a life sentence, will be eligible for some form of parole.

During punishment deliberations, the jury sent out a note requesting Dr. Fason's testimony.

## II. Plurality Opinion

Appellant makes two important distinctions which the plurality fails to appreciate in its cursory, paragraph-long discussion of his eleventh point of error. *Smith v. State*, 898 S.W.2d at 853–854 (Tex.Crim.App. Mar. 8, 1995). First, while appellant concedes that *when* he would likely be paroled is not a proper consideration for the jury when deliberating punishment, he argues that the earliest date upon which he would become *eligible* for parole was necessary for the jury to give mitigating effect to Dr. Fason's testimony. In other words, appellant's instruction does not invite jurors to speculate about *when* the Board of Pardons and Paroles might release him on parole in violation of Article II, § 1 of the Texas Constitution. Rather, appellant seeks to inform jurors that if he is sentenced to life imprisonment he must serve a fixed, statutory minimal length of that sentence before even becoming *eligible* for parole.[5]

The plurality maintains that this contention was raised and rejected in *Elliott v. State*, 858 S.W.2d 478, 489–90 (Tex.Crim.App. 1989). *Smith*, at 853. Our opinion in *Elliott* fails to specify what instruction was requested; this Court merely refers to Elliott's "requested instruction on the Texas parole laws." *Elliott*, 858 S.W.2d at 489. Accordingly, *Elliott* is not dispositive of the issue at hand.

Second, appellant does *not* argue that his requested instruction is mitigating evidence *in and of itself*, rather he argues that the instruction is necessary for the jury to "give effect" to Dr. Fason's testimony. The plurality's assertion that "the concept of parole eligibility 'bears no relationship to the nature of the offense or character of the offender,'" *Smith*, at 853 (*quoting Andrade v. State*, 700 S.W.2d 585, 590 (Tex.Crim.App.1985) (Teague, J., concurring)), is misplaced and illustrates its misunderstanding of appellant's contention. *See also id.*, at 853 n. 25. Parole eligibility is certainly not inherently mitigating evidence. However, it makes little sense to allow the jury to hear the testimony of Dr. Fason, which this Court held to be mitigating in *Matson v. State*, 819 S.W.2d 839 (Tex.Crim.App.1991), without allowing the jury to meaningfully consider and give effect to his testimony.

The trial court's refusal of appellant's minimum incarceration period instruction violated appellant's rights under the Eighth Amendment, applicable to the states through the Fourteenth Amendment,[6] particularly in light of our decision in *Matson*, 819 S.W.2d 839,

---

5. Calvin A. Hartmann, Assistant District Attorney, Harris County, in a recent presentation at the Texas District and County Attorneys Association Capital Murder Seminar suggested that the type of parole instruction requested by appellant be given: "[T]he more prudent action would be to continue to voir dire and give parole eligibility instructions, particularly where requested by the defense until the Court of Criminal Appeals issues a definitive opinion." Attached to Hartmann's paper is a proposed charge on punishment which includes an underlined portion he suggests should be given "if requested by defendant." The underlined portion states:

You are instructed that a prisoner serving a life sentence for the offense of capital murder is not eligible for release on parole until the actual calendar time the prisoner has served,

without consideration of good time, equals [twenty (20) years if offense committed before 9/1/87; fifteen (15) years if offense committed after 9/1/87–9/1/91].

Calvin A. Hartmann, "Capital Murder Seminar: Jury Instructions" at 15–17 & Appendix (presented Feb. 10, 1995 at the Texas District and County Attorneys Association Capital Murder Seminar). This is the precise instruction requested by appellant in the instant case.

6. *See Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) (holding that California's narcotics addiction statute inflicted a cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments); *see also Furman v. Georgia*, 408 U.S. 238, 258, 92 S.Ct. 2726, 2736, 33 L.Ed.2d 346 (Brennan, J., concurring) (1972); *Louisiana ex*

established Eighth Amendment death penalty jurisprudence, and the Supreme Court's decision in *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). Due to the likelihood of juror misunderstanding regarding the meaning of "life imprisonment" and "society," and jurors' inability to give effect to relevant mitigating evidence of decreased recidivism and propensity for violence over time, the trial court unconstitutionally denied appellant's minimum incarceration instruction. Further, this conclusion is consistent with the "truth in sentencing" policy of the State of Texas.

Appellant's requested instruction is not mitigating evidence in and of itself; rather, it is necessary to allow jurors to give effect to appellant's mitigating evidence of decreasing rates of recidivism and propensity for violence. Accordingly, a defendant may obtain relief in situations where:

1. Defendant has introduced evidence during the punishment phase of decreasing recidivism rates and propensity for violence over time;

2. Defendant has requested and the trial court has denied an instruction informing the jury of the statutory minimum number of years a defendant sentenced to "life imprisonment" would serve before becoming *eligible* for parole;

3. Defendant has claimed that the trial court's denial of the instruction violated his rights under the Eighth Amendment.[7]

### III. Eighth Amendment

The United States Supreme Court has held that in capital cases "the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). The premise of the *Woodson* Court's conclusion was that the penalty of death is qualitatively different from other penalties; this difference mandates a greater or heightened degree of reliability when a sentence of death is imposed. *Id.* at 305, 96 S.Ct. at 2991–92. In *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer not be statutorily precluded from considering any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant may offer as mitigating. The Ohio death penalty statute at issue provided that once defendants were found guilty of murder with at least one of seven specified aggravating circumstances, sentencers were required to impose the death penalty once they determined that the victim did not induce or facilitate the offense, that the defendant did not act under duress or coercion, and that the offense was not primarily the product of the defendant's mental deficiency. The Court held that the limited range of mitigating circumstances that the sentencer could consider under the Ohio statute was incompatible with the Eighth and Fourteenth Amendments. *Id.* at 607–08, 98 S.Ct. at 2966–67. The *Lockett* Court defined as "mitigating" any factor that might serve "as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at 2965.

Applying the rule in *Lockett*, the Supreme Court later held that just as a state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 113–15, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982). Citing *Lockett* and *Eddings*, the Supreme Court in *Skipper v. South Carolina*, 476 U.S.

rel. *Francis v. Resweber*, 329 U.S. 459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1946).

7. This dissent does not address the issue of whether a defendant has a right to an instruction or expert testimony concerning when, if ever, a defendant will actually be paroled, nor does it address whether the State has any rights regarding parole instructions or related evidence.

1, 3–4, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986), held that the exclusion of evidence of defendant's good behavior in prison during the seven months he spent in jail awaiting trial deprived him of his right to place before the sentencer relevant evidence in mitigation of punishment.

The Supreme Court has also addressed the Texas capital punishment scheme, most notably in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), and *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In *Jurek*, 428 U.S. at 262, 96 S.Ct. at 2951–52, the Supreme Court affirmed the decision of this Court rejecting an Eighth Amendment challenge to the constitutionality of the Texas death penalty scheme. The Supreme Court held that the Texas scheme withstood constitutional challenge because it authorized the defense to bring before the jury "whatever mitigating circumstances relating to the individual defendant [that] can be adduced...." *Id.* at 278, 96 S.Ct. at 2959. The *Jurek* Court emphasized that the jury "must be allowed to consider on the basis of all relevant evidence not only why a death sentence would be imposed, but also why it should not be imposed." *Id.* at 271, 96 S.Ct. at 2956.

In *Franklin*, 487 U.S. at 185, 108 S.Ct. at 2333 (O'Connor, J., concurring), Justice O'Connor's concurring opinion recognized that the right to have the sentencer consider and weigh mitigating evidence would be "meaningless" unless the jury was also permitted to "give effect" to that evidence. Consistent with her concurrence in *Franklin*, Justice O'Connor's majority opinion in *Penry*, 492 U.S. at 318, 109 S.Ct. at 2946–47, held that the Texas scheme did not provide the jury with a vehicle to give effect to the mitigating evidence of Penry's mental retardation and disadvantaged background:

> [I]t was clear from *Lockett* and *Eddings* that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and

giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigates against imposing the death penalty.

*Id.* at 318, 109 S.Ct. at 2946–47. Thus, not only must a Texas jury be able to consider mitigating evidence, but the jury must be provided with a vehicle to give effect to that evidence.

### A. *Matson v. State*

This Court addressed the issue of mitigating evidence in *Matson*, 819 S.W.2d at 850–51, in which the defendant challenged the trial court's refusal to allow the jury to hear expert testimony on the subject of decreasing recidivism and propensity for violence over time which the defendant argued was relevant to whether there was a substantial probability that he would commit criminal acts of violence in the future. Relying on *Lockett, Eddings, Jurek,* and *Skipper,* Presiding Judge McCormick's majority opinion held that the trial court abused its discretion in preventing the jury from hearing this relevant mitigating evidence:

> Clearly then, for the Texas death penalty statutes to meet constitutional muster, the sentencing authority in a capital case must be allowed to consider and give effect to all relevant mitigating evidence.

*Matson*, 819 S.W.2d at 851.

Notably, Matson did not raise and this Court did not address whether a minimum incarceration instruction was required for the jury to give effect to testimony concerning decreasing recidivism and propensity for violence over time; we merely held that preventing the defendant from offering such evidence violated the Eighth Amendment. *See also Jackson v. State*, 822 S.W.2d 18, 25 (Tex.Crim.App.1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 3034, 125 L.Ed.2d 722 (1993).

### B. *Simmons v. South Carolina*

In *Simmons*, —— U.S. at ——, 114 S.Ct. at 2190, a plurality of the Supreme Court held that when a defendant's future dangerousness is at issue and the defendant is ineligi-

ble for parole, due process requires that the jury assessing punishment be told that the defendant is parole ineligible. Justice Souter, joined by Justice Stevens, wrote separately to explain that the Eighth Amendment also compelled the decision of the plurality.[8] *Id.* at ——, 114 S.Ct. at 2198 (Souter, J., concurring). Concerned that the jury might not understand the meaning of "life imprisonment," Simmons requested a jury instruction regarding his parole ineligibility. *Id.* at ——, 114 S.Ct. at 2191 n. 2. The plurality held that "[i]n assessing future dangerousness, *the actual duration of the defendant's prison sentence is indisputably relevant.*" *Id.* at ——, 114 S.Ct. at 2194 (emphasis added).

At issue in the instant case is the applicability of *Simmons* to the Texas capital sentencing scheme. Because Texas provides for a statutory "future dangerousness" issue in every capital case, the prosecution will always argue that the defendant will pose a future danger to society if not executed by the State. Unlike South Carolina, in Texas future dangerousness is a threshold issue in securing a death sentence; that is, if the jury does not answer the second special issue in the affirmative, a life sentence will automatically be imposed.

While *Simmons* involved a defendant who was not eligible for parole, the Supreme Court's rationale logically extends to defendants in Texas who are statutorily ineligible for parole for a substantial period of time.[9] The reasoning of the *Simmons* Court is based in large part on the potential for juror

---

8. Justices Souter and Stevens believe that the Eighth Amendment compelled the decision, "regardless of whether future dangerousness is an issue at sentencing." *Simmons,* —— U.S. at ——, 114 S.Ct. at 2198 (Souter, J., concurring). *But see id.* at ——, 114 S.Ct. at 2200 (O'Connor, J., concurring) ("[I]f the prosecution does not argue future dangerousness, the State may appropriately decide that parole is not a proper issue for the jury's consideration even if the only alternative sentence to death is life imprisonment without possibility of parole.").

9. Following its decision in *Simmons,* the Supreme Court remanded four cases for consideration in light of *Simmons.* In each of these cases, the appellant was eligible for parole. Three of the cases have been considered on remand by state courts. *North Carolina v. Price,* 337 N.C. 756, 448 S.E.2d 827 (1994), *petition for cert. denied* —— U.S. ——, 115 S.Ct. 1368, 131 L.Ed.2d 224 (1995) (holding *Simmons* inapplicable on remand because appellant would have been eligible for parole and jury made no inquiry); *Wright v. Virginia,* 248 Va. 485, 450 S.E.2d 361 (1994) (holding that *Simmons* did not apply even though jury predicated death sentence on future dangerousness because appellant would have been eligible for parole); *Cardwell v. Virginia,* 248 Va. 501, 450 S.E.2d 146 (1994), *petition for cert. filed* (U.S. Feb. 2, 1995) (No. 94–7930) (holding that *Simmons* did not apply because appellant would have been eligible for parole). One case has not been addressed on remand. *Mickens v. Virginia,* —— U.S. ——, 115 S.Ct. 307, 130 L.Ed.2d 271 (1994), *vacating and remanding* 247 Va. 395, 442 S.E.2d 678 (1994).

*Price, Wright,* and *Ramdass* are state supreme court decisions, and, while petitions for certiorari have been filed in *Price* and *Ramdass,* the United States Supreme Court has not revisited the *Simmons* issue.

In addition to the cases remanded by the United States Supreme Court, other courts have considered *Simmons.* These cases may be grouped in the following five groups:

(1) cases that have required or suggested on remand a parole instruction in light of *Simmons. State v. Ross,* 230 Conn. 183, 646 A.2d 1318, 1368 (Conn.1994) (remanding for new sentencing hearing on other grounds; trial judge instructed to consider giving *Simmons* instruction because appellant would be ineligible for parole); *Clark v. Tansy,* 118 N.M. 486, 882 P.2d 527, 530 (1994), *reh'g denied* (N.M. October 3, 1994) (holding that *Simmons'* due process analysis required court to give instruction, per defendant's request, regarding amount of time he would serve for noncapital offenses to rebut aggravating evidence; the need for heightened reliability mandates recognition of defendant's right to require an instruction on legal terms so that the jury may make a reasoned moral choice).

While ultimately holding on due process grounds that the trial court was required to give the instruction, the *Clark* Court utilized the Eighth Amendment principles discussed in this dissent to reach its result.

(2) cases that have held that *Simmons* did not apply because future dangerousness considerations were not present or were dissimilar from *Simmons. Allridge v. Scott,* 41 F.3d 213 (5th Cir.1994) (holding that defendant must be parole ineligible as a matter of law and not merely of fact to require admission of expert testimony under *Simmons;* stating that under *Simmons* due process requires the State to inform the jury of defendant's parole ineligibility where it argues that defendant would be a danger to the free world and where defendant is legally ineligible for parole); *United States ex rel. Collins v. Welborn,* 868 F.Supp. 950

(N.D.Ill.1994) (holding that *Simmons* not violated by failure to give parole instruction because prosecutor argued defendant would be dangerous in prison or if he escaped, not if paroled); *State v. Southerland,* 447 S.E.2d 862, 868 (S.C.1994), *petition for cert. denied* —— U.S. ——, 115 S.Ct. 1136, 130 L.Ed.2d 1096 (1994) (holding that defendant not entitled to parole instruction under Due Process Clause because future dangerousness not at issue nor under Eighth Amendment because jury informed that defendant would not be eligible for parole during closing arguments; requiring instruction when future dangerousness at issue, jury asks about meaning of "life", or defendant requests instruction); *Cardwell v. Commonwealth,* 248 Va. 501, 450 S.E.2d 146 (1994), *petition for cert. filed* (U.S. February 2, 1995) (No. 94–7930) (holding *Simmons* inapplicable because jury sentenced defendant to death based on vileness and not future dangerousness).

Because the prosecution must prove defendant's future dangerousness beyond a reasonable doubt under the special issues scheme in *every* capital case in Texas, *Welborn, Southerland,* and *Cardwell* are not dispositive. Further, these cases were decided on due process grounds while the instant case relies on the Eighth Amendment. *Allridge* can be distinguished from the instant case on at least two grounds: (1) The defendant in *Allridge* requested that the trial court admit expert testimony speculating that he would never be paroled (parole ineligible as a matter of fact), while appellant in the instant case requested an instruction that he would be parole ineligible for fifteen years (parole ineligible as a matter of law); (2) The *Allridge* Court relies on the due process reasoning of the majority in *Simmons,* while the analysis in the instant case is grounded in the Eighth Amendment principle of heightened reliability in capital sentencing.

(3) cases that have held that *Simmons* did not apply because the defendant was eligible for parole. *Kinnamon v. Scott,* 40 F.3d 731 (5th Cir.1994) (holding *Simmons* claim procedurally barred and not retroactive, but if considered on merits *Simmons* would not apply because petitioner was eligible for parole); *Ingram v. Zant,* 26 F.3d 1047, 1052–54 (11th Cir.1994) (holding no violation of Eighth Amendment when petitioner denied instruction on parole because petitioner had no federal right to prevent jury consideration of parole or to have the jury properly instructed; *Simmons* inapplicable because petitioner eligible for parole); *Burgess v. State,* 264 Ga. 777, 450 S.E.2d 680, 693 (1994), *reh'g denied* (Ga. December 20, 1994) (requiring *Simmons* instruction only when State argues future dangerousness during sentencing and state law prohibits release on parole, but here defendant eligible for parole); *State v. Skipper,* 337 N.C. 1, 446 S.E.2d 252, 275–76 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 953, 130 L.Ed.2d 895 (U.S.N.C.1995)

(holding *Simmons* inapplicable because defendant eligible for parole; noting that parole eligibility is not mitigating evidence because not part of the defendant's character or record or a circumstance of the offense); *State v. Bacon,* 337 N.C. 66, 446 S.E.2d 542 (1994), *petition for cert. denied* —— U.S. ——, 115 S.Ct. 1120, 130 L.Ed.2d 1083 (1994) (holding that *Simmons* did not control because defendant eligible for parole where defendant claimed issue of parole raised when witnesses asked if would allow defendant into their homes after release); *State v. Payne,* 337 N.C. 505, 448 S.E.2d 93, 99 (1994), *petition for cert. filed* (U.S. January 27, 1995) (No. 94–7873) (holding that no parole instruction required under *Simmons* because defendant would have been eligible for parole where defendant requested instruction about life sentence in Virginia and fact that life sentences could be served consecutively); *State v. Robinson,* 339 N.C. 263, 451 S.E.2d 196, 205 (N.C.1994) (denying motion to permit questioning of venire about parole eligibility under *Simmons* because defendant would have been eligible for parole); *Cardwell,* 450 S.E.2d 146 (Va.1994), *petition for cert. filed* (U.S. February 2, 1995) (No. 94–7930) (holding *Simmons* inapplicable in part because defendant eligible for parole).

As stated in part II, *supra,* appellant in the instant case requested a specific instruction: Appellant requested that the trial court instruct the jury that he would be parole ineligible for fifteen years as a matter of state law. Because the instructions requested above differ in this important respect from the instant case or the holdings were based on due process grounds, the precedential value of these cases is limited.

(4) cases with procedural problems. *Kinnamon,* 40 F.3d 731 (holding claim procedurally barred and *Simmons* not cognizable on collateral review); *Allridge,* 41 F.3d 213 (5th Cir. 1994) (holding *Simmons* not cognizable on collateral review); *Ingram,* 26 F.3d 1047 (11th Cir.1994) (holding *Simmons* not cognizable on collateral review).

Unlike defendants in *Kinnamon, Allridge* and *Ingram,* appellant is on direct review, his claim is cognizable on direct review, and he has properly preserved error.

(5) cases where *Simmons* was discussed for other reasons. *Shannon v. United States,* —— U.S. ——, ——, 114 S.Ct. 2419, 2424 n. 4, 129 L.Ed.2d 459 (1994) (citing *Simmons* for the proposition that capital juries have sentencing responsibilities); *Fero v. Kerby,* 39 F.3d 1462 (10th Cir.1994) (holding *Simmons* inapplicable where State was not seeking the death penalty); *State v. Cornell,* 179 Ariz. 314, 878 P.2d 1352, 1374 (1994) (citing *Simmons* for requirement of heightened reliability where defendant had represented himself until sentencing phase, and counsel appointed for sentencing was denied continuance); *Thornton v. State,* 264 Ga. 563, 449 S.E.2d 98, 113 (1994) (holding Simmons instruction not required where

misunderstanding and misperception regarding parole eligibility:

> To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility. . . .

*Id.* at ——, 114 S.Ct. at 2193.[10]

The potential for juror misunderstanding and misperception regarding parole and the true meaning of "life imprisonment" is likely in Texas, where jurors must consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to *society.*" Tex.Code Crim.Proc.Ann. art. 37.071 (emphasis added). First, "society" does not have a statutory definition under the Texas scheme, and jurors are given no guidance in this regard. Second, typical jury instructions at punishment may exacerbate juror misunderstanding and actually invite speculation about parole.

While this Court has held on appeal that "society" includes prison society and free society, jurors are not similarly informed. *See, e.g., Muniz v. State,* 851 S.W.2d 238, 250 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 116, 126 L.Ed.2d 82 (1994); *Jones,* 843 S.W.2d at 495; *Boyd v. State,* 811

S.W.2d 105, 118 n. 12 (Tex.Crim.App.1991), *cert. denied,* 502 U.S. 971, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991); *see also Franklin,* 487 U.S. at 179 n. 9, 108 S.Ct. at 2330 n. 9 ("[T]he question of a defendant's likelihood of injuring others in prison is precisely the question posed by the second Texas Special Issue [future dangerousness]."). Defendants are not entitled to a jury instruction defining "society" because of the presumption that all undefined words in the Texas Code of Criminal Procedure have a commonly understood meaning that jurors know and apply. *See Caldwell v. State,* 818 S.W.2d 790, 797–98 (Tex.Crim.App.1991), *cert. denied,* 503 U.S. 990, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992). While we have further held that "society" is not unconstitutionally vague as applied without a definition, *e.g., id.* at 798–99; *Rougeau v. State,* 738 S.W.2d 651, 660 (Tex.Crim.App. 1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988), *overruled on other grounds, Harris v. State,* 784 S.W.2d 5 (Tex.Crim.App.1989), we have recognized that many jurors are confused about whether it refers to free society, prison society, or society as a whole. *See, e.g., Felder v. State,* 758 S.W.2d 760, 764 (Tex.Crim.App.1988).

At the time of appellant's punishment hearing, typical jury instructions in capital cases, and the instructions used in the instant case provided as follows:

> You are instructed that if you return a negative finding on any special issue submitted to you, *the court shall sentence the defendant* to the institutional division of

---

jury asked question regarding the meaning of "life imprisonment," but later withdrew it); *State v. Jones,* 639 So.2d 1144, 1154–55 (La. 1994) (citing *Simmons* in holding that clemency instruction included in statutory jury instruction rendered statute unconstitutional under the state constitutional provision against cruel and unusual punishment; noting that under *Simmons* procedures which undermine the reliability of the sentencing process violate prohibition of cruel and unusual punishment); *State v. Cunningham,* 320 Or. 47, 880 P.2d 431, 448 (1994) (Fadeley, J., dissenting) (stating that standardless and unreviewable statute should be held unconstitutional while citing *Simmons* for due process requirement of reliability); *State v. Delisle,* 648 A.2d 632 (Vt.1994)

(Johnson, J., concurring) (citing *Simmons* for proposition that juries sometimes do not or will not follow instructions).

**10.** Justice O'Connor, in her concurrence in *Simmons,* appears to construe the plurality's due process argument as limited to situations where the State puts the defendant's future dangerousness at issue and the only available alternative sentence to death is life imprisonment without possibility of parole. However, O'Connor acknowledges that jurors often make decisions without accurate information: "[C]ommon sense tells us that many jurors do not know whether a life sentence carries with it a possibility of parole." *Simmons,* —— U.S. at ——, 114 S.Ct. at 2201 (O'Connor, J., concurring).

the Texas Department of Criminal Justice *for life.* (emphasis added).

and:

> During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or of the Governor, *or how long the defendant would be required to serve to satisfy a sentence of life imprisonment.* (emphasis added).

These instructions indicate that sentencing the defendant to prison "for life" does not actually mean that the defendant will spend the rest of his life in prison, rather he will be released at some point, once he has "satisf[ied] a sentence of life imprisonment." Jurors are forced to perform the impossible: They must put the "possibility of parole" completely out of their minds when deciding whether a defendant would pose a continuing threat to society, *Felder,* 758 S.W.2d at 764, without presuming "that a defendant sentenced to life will serve the rest of his life in prison." *Boyd,* 811 S.W.2d at 121. How then can the jury decide whether a defendant will pose a continuing threat to society in the future without considering where the defendant will be if not executed? A jury's task is that much more difficult when it is presented with testimony indicating that a defendant's propensity for violence differs significantly depending on his environment. That is, a defendant's propensity for violence in a prison setting may be markedly less than his propensity for violence in the free world. Without instructions as to where the defendant will be if given a life sentence or how long he will be incarcerated, a jury's task may be further complicated by testimony that recidivism rates and propensity for violence tend to decrease with time.

Moreover, instructions telling jurors not to consider the possibility of parole invite speculation about parole. The trial court in *Simmons,* —— U.S. at ——, 114 S.Ct. at 2197, similarly admonished the jury that "you are instructed not to consider parole" and that parole "is not a proper issue for your consideration." The Supreme Court recognized that the instruction "was confusing and frustrating to the jury" in suggesting that parole was available, but at the same time instructing the jury to be blind to this fact. Although parole was not available to Simmons, but is available to capital defendants in Texas, jurors are no less confused or frustrated. In Texas, while there is not "a single case which arguably supports [the] theory that a potential juror's 'view is supposed to be that a defendant sentenced to life will serve the rest of his life in prison,'" *Boyd,* 811 S.W.2d at 121, it is presumed that jurors do not consider parole in relation to the special issues.

While we ordinarily presume that jurors follow the court's instructions, *see Rose v. State,* 752 S.W.2d 529, 554 (Tex.Crim.App. 1988), "in some circumstances, 'the risk that the jury will not, or cannot follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'" *Simmons,* —— U.S. at ——, 114 S.Ct. at 2197 (citations omitted). The limitations of Texas' capital sentencing scheme cannot be ignored, particularly in light of a recent study of the substantially similar special issues scheme in Oregon, and numerous studies from other states indicating that, despite instructions to the contrary, jurors invariably consider the possibility that the defendant will be released from prison on parole.[11]

Without instruction on the applicable parole eligibility law, such speculation is un-

---

11. *See* Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework,* 18 Law & Human Behavior 151 (1994) (Texas juries); *Simmons,* —— U.S. at —— n. 9, 114 S.Ct. at 2197 n. 9. The Oregon study was conducted by interviewing a random sample of three jurors from each of nine capital juries over a two year period in a county in

Oregon. Of the nine juries, five answered the special issues, which are patterned after Texas law, to render a death sentence, and four rendered a life sentence. Only seven of the twenty-seven jurors believed that the sentence rendered would be carried out. That is, members of "life" juries believed that the defendant would be released early, and members of "death" juries believed execution would not occur. Twenty-three

informed and diminishes the reliability of the sentencing process. While the plurality recognizes that Texas provides some procedural protections in an attempt to minimize juror misunderstanding, these protections do not compel us to disregard the risk that the jury will not, or cannot follow instructions.

The plurality, in its discussion of appellant's ninth point of error, notes three procedural protections, *Smith*, at —— – ——, but overstates their efficacy. First, the plurality asserts that the State is not permitted to argue to the jury that a defendant should be sentenced to death because he will be released from prison on parole. *Id.*, at 852. However, such error is not reversible unless the argument is "extreme or manifestly improper, violative of a mandatory statute, or injects new facts, harmful to the accused, into the trial." *Franklin v. State*, 693 S.W.2d 420, 429 (Tex.Crim.App.1985) (holding closing argument error harmless), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). Second, the plurality states that if a jury considers parole in its deliberations, a defendant may be entitled to

a new trial. *Smith*, at 852. But, the plurality does not acknowledge that in order to obtain relief, a defendant must meet the rigorous standard set out in *Sneed v. State*, 670 S.W.2d 262, 266 (Tex.Crim.App.1984); *see also Buentello v. State*, 826 S.W.2d 610, 610–14 (Tex.Crim.App.1992). Third, counsel is permitted to examine prospective jurors about *whether they think* they are able to follow an instruction forbidding consideration of parole in their deliberations, and counsel may challenge for cause *jurors who maintain* that they are unable to set aside parole from their consideration. *Smith*, at 852. Here, the plurality fails to recognize that jurors who think or state that they can obey an instruction may not actually be able to do so. Our discussion in part III.B., *supra*, illustrates this point. Additionally, the plurality neglects to note that this Court grants considerable latitude and deference to trial courts regarding jury strikes, thus rendering the decisions of trial courts practically unreviewable except in extraordinary cases. *E.g., Vuong v. State*, 830 S.W.2d 929, 943 (Tex. Crim.App.1992) *cert. denied*, —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992).

of the twenty-seven jurors thought the possibility of parole was an important factor when answering the special issues. Interestingly, the jurors on one of the juries rendering a life sentence did so because they believed the defendant would be too old when released to be a danger to society. The jurors on one of the death juries rendered a death sentence because it believed that the defendant would still be young enough to pose a threat to society after release.

The *Simmons* plurality also cited to articles discussing public opinion and juror surveys that support the "commonsense understanding" that there is a reasonable likelihood of juror misperception about the meaning of the term "life imprisonment." *Simmons*, —— U.S. at —— n. 9, 114 S.Ct. at 2197 n. 9. In *Capital Punishment & Contemporary Misperceptions*, 27 Law & Society 157, 168–71 (1993), William Bowers discussed a study based on surveys of capital jurors and citizens who had not served as capital jurors in New York, Nebraska, South Carolina, California, and Florida. The study found that both jurors and citizens grossly underestimate the amount of time a defendant will serve if sentenced to life. Fifty percent of the citizens surveyed in Nebraska believed that the penalty for murder was fifteen years or less when the penalty was actually life without parole. One in four juries in Georgia interrupted deliberations to submit a question to

the court. Ninety percent of the questions asked were about the meaning and duration of a "life" sentence. The earlier jurors believe defendants will be released, the more likely they are to opt for a death sentence. The study indicates that in states where fewer jurors have accurate information about parole eligibility laws, this relationship is more pronounced.

A study of capital jurors in Virginia found that jurors believed that capital defendants would only serve one-half the time they actually were required to serve. William W. Hood, III, *The Meaning of "Life" for Virginia Jurors and Its Effect on Reliability in Capital Sentencing*, 75 Va.L.Rev. 1605, 1624 (1989). Hood concluded that this misunderstanding led jurors to make decisions "based on caprice or emotion rather than properly informed reason." *Id.* Finally, Theodore Eisenberg and Martin T. Wells discussed a study that found that jurors who believe that defendants sentenced to life will have to serve only a short period of time in prison (16.8 years) tend to render death sentences. In contrast, jurors who believe that defendants sentenced to life will have to serve a substantially greater period of time in prison (23.8 years) tend to render sentences of life imprisonment. Theodore Eisenberg & Martin T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L.Rev. 1 (1993).

The potential damaging effect of juror speculation may be increased by general, though frequently inaccurate, knowledge of parole law. As the plurality in *Simmons* noted:

It can hardly be questioned that most juries lack accurate information about the precise meaning of "life imprisonment" as defined by States. . . . For much of our country's history, parole was a mainstay of state and federal regimes, and every term (whether a term of life or a term of years) in practice was understood to be shorter than the stated term. . . . [I]t is impossible to ignore "the reality known to the 'reasonable juror,' that, historically, life-term defendants have been eligible for parole."

*Simmons,* —— U.S. at ——, 114 S.Ct. at 2197 (citations omitted). This Court has repeatedly recognized that it is "common knowledge" in Texas that parole is a frequent occurrence. *See, e.g., Felder,* 758 S.W.2d at 762; *Sneed,* 670 S.W.2d at 264–66 ("[I]t is common knowledge that from time to time inmates of the Texas Department of Corrections are released on parole. . . ."). Further, the likelihood that jurors have accurate knowledge of the applicable parole law in a given case is decreased significantly due to the Legislature's frequent amending of Tex.Code Crim. Proc.Ann. art. 42.18 § 8. The parole law for capital defendants in Texas has changed four times in the past ten years, from a minimum of twenty calendar years in 1985, to fifteen years in 1987, to thirty-five years in 1991, to forty years in 1993.[12]

Withholding parole eligibility information from juries fosters their distorted view of the actual effect of the noncapital sentencing alternative, creating a needless and substantial risk that juries will impose the death penalty in an effort to eliminate what is in reality a nonexistent danger of release on parole within a relatively short period of time. In addition, the need for heightened reliability mandates a recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentencing options. As in *Simmons:*

whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request should be vacated as having been "arbitrarily or capriciously" and "wantonly and . . . freakishly imposed."

*Simmons,* —— U.S. at ——, 114 S.Ct. at 2198 (Souter, J., concurring) (citations omitted). The *Simmons* plurality concluded that the State denied Simmons due process in securing a death sentence based in part on his future dangerousness while concealing from the jury the true meaning of its noncapital sentencing alternative. *Id.* at ——, 114 S.Ct. at 2193. In their concurring opinion, Justices Souter and Stevens observed that the Eighth Amendment's heightened reliability requirement in capital cases similarly mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences available. *Id.* at ——, 114 S.Ct. at 2198 (Souter, J., concurring).

### C. *Matson v. State* and Heightened Reliability

Although the plurality in *Simmons* did not reach the Eighth Amendment issue,[13] it is incorrect to conclude that the Eighth Amendment sanctions concealing from the jury the true meaning of the noncapital sentencing alternative in Texas, where "future dangerousness" is a threshold jury determination in every case and where the Legislature has provided for mandatory, substantial periods of incarceration without the possibility of parole for capital defendants who are not sentenced to death. An Eighth Amendment analysis of the Texas scheme logically follows from this Court's decision in *Matson,* 819

---

12. Acts 1985 69th Leg., Ch. 427 § 2 (20 years); Acts 1987 70th Leg., Ch. 384 § 5 (15 years); Acts 1991 72nd Leg., Ch. 652 § 10 (35 years); Acts 1993 73rd Leg., Ch. 900 § 6.01 (40 years).

13. *Id.* at ——, 114 S.Ct. at 2193 n. 4.

S.W.2d 839 (Eighth Amendment basis), and the heightened reliability requirement of *Lockett*, 438 U.S. at 586, 98 S.Ct. at 2955, and *Eddings*, 455 U.S. at 104, 102 S.Ct. at 871, as applied to Texas in *Jurek*, 428 U.S. at 262, 96 S.Ct. at 2951–52, *Franklin*, 487 U.S. at 164, 108 S.Ct. at 2321–22, and *Penry*, 492 U.S. at 302, 109 S.Ct. at 2937–38. Additionally, the distinction between the Due Process Clause and the Eighth Amendment is increasingly elusive in death penalty jurisprudence.

This Court has held that the Eighth Amendment requires that capital defendants be allowed to present evidence of the relationship between recidivism and propensity for violence and the length of incarceration and age of the offender. *Matson*, 819 S.W.2d at 851. However, it is not enough that jurors hear this relevant mitigating evidence. The right to have the sentencer consider and weigh mitigating evidence is "meaningless" unless the jury is permitted to "give effect" to that evidence. *See Franklin*, 487 U.S. at 185, 108 S.Ct. at 2333 (O'Connor, J., concurring); *Penry*, 492 U.S. at 318, 109 S.Ct. at 2946–47. In other words, the *Matson* decision is incomplete: Without a jury instruction indicating the minimum time that the defendant will be incarcerated, jurors cannot "give effect" to *Matson* evidence (*e.g.*, that a defendant's propensity for violence is significantly reduced when in a prison environment instead of in the free world, that his propensity for violence will likely decrease over time, or that the likelihood of recidivism decreases with the length of time he is incar-

cerated.) Because our holding in *Matson* is limited to the proposition that recidivism and propensity for violence evidence is relevant and mitigating, it only reaches part of the way toward full realization of a capital defendant's rights under the Eighth Amendment.

Moreover, appellant's minimum incarceration instruction is analyzed under the Eighth Amendment instead of the Due Process Clause used by the plurality in *Simmons*, — U.S. at —, 114 S.Ct. at 2187, because the Eighth Amendment requirement of heightened reliability provides stronger grounding for the proposition that a capital defendant in Texas has a right to require instructions on "the meaning of the legal terms used" where there is a reasonable likelihood of juror misunderstanding and misperception. *Id.* at —, 114 S.Ct. at 2198 (Souter, J., concurring). While the *Simmons* plurality persuasively demonstrated that jurors in general are likely to misunderstand the meaning of "life" imprisonment, *id.* at —, 114 S.Ct. at 2193, the discussion above demonstrates that in Texas the potential for misunderstanding and misperception is significant. *See supra* parts III.B. & C.

Due process and Eighth Amendment principles are interconnected in capital jurisprudence.[14] It is significant that the constitutional basis for the majority and concurrence in *Skipper* eight years later becomes the basis for the concurrence and plurality, respectively, in *Simmons*. In *Skipper*, 476 U.S. at 1, 106 S.Ct. at 1669, a majority of the Court decided that the exclusion of evidence

**14.** In its consideration of the issue of capital punishment in the 1970s, the Supreme Court initially rejected a claim that permitting a jury to impose the death penalty without governing standards violated due process in *McGautha v. California* and *Crampton v. Ohio*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). However, one year later, the Supreme Court held that permitting a jury to impose the death penalty in the absence of governing standards constituted "cruel and unusual" punishment in violation of the Eighth Amendment. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In his dissent in *Furman*, Chief Justice Burger criticized Justice Stewart's and Justice White's concurring opinions for concluding that Georgia's system of discretionary sentencing in capital cases violated the Eighth Amendment because

it failed to produce evenhanded justice. He argued that the claim of "arbitrariness" in sentencing fails to establish that the death penalty is "cruel and unusual" punishment: "The approach of these concurring opinions has no antecedent in the Eighth Amendment cases. It is essentially and exclusively a procedural due process argument." *Furman*, 408 U.S. 238, 399, 92 S.Ct. 2726, 2809 (Burger, C.J., dissenting).

In subsequent capital decisions grounded in due process principles, it appears that the Supreme Court has abrogated the holding of *McGautha* and *Crampton*. *E.g., Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Skipper*, 476 U.S. 1, 106 S.Ct. 1669; *Simmons*, — U.S. —, 114 S.Ct. 2187.

of a defendant's good behavior in prison deprived him of his Eighth Amendment right to place before the sentencer relevant evidence in mitigation of punishment. Justice Powell's concurrence reached the same result based on the Due Process Clause. *Skipper,* 476 U.S. at 9, 106 S.Ct. at 1673–74. While the *Simmons'* plurality holding that the defendant was improperly deprived of a jury instruction on parole was based on due process principles, one of the concurrences reached the same result based on Eighth Amendment principles. *Id.* at 1, 114 S.Ct. at 2198 (Souter, J., concurring).

Moreover, the *Skipper* plurality highlighted the relatedness of the two constitutional provisions:

> [W]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, *it is not only the rule of Lockett and Eddings that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement* that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain."

*Skipper,* 476 U.S. at 5 n. 1, 106 S.Ct. at 1671 n. 1 (quoting *Gardner v. Florida,* 430 U.S. 349, 352, 97 S.Ct. 1197, 1201–02, 51 L.Ed.2d 393 (1977)) (emphasis added). Justice Scalia, in his dissent in *Simmons,* also underscores the interconnectedness of the Due Process Clause and the Eighth Amendment:

> [The plurality] adds to our insistence that State courts admit "all relevant mitigating evidence," see, *e.g., Eddings v. Oklahoma,* 455 U.S., 104, 102 S.Ct. 869, 71 L.Ed.2d 1, (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a requirement that they adhere to distinctive rules, more demanding than what the Due Process Clause normally requires, for admitting evidence of other sorts—Federal Rules of Death Penalty Evidence, so to speak. . . .

*Simmons,* —— U.S. at ——, 114 S.Ct. at 2205 (Scalia, J., dissenting). In light of this

Court's decision in *Matson* and the heightened reliability requirement, most recently discussed in Justices Souter's and Stevens' concurrence in *Simmons,* the Eighth Amendment is violated when a capital defendant presents evidence of decreasing rates of recidivism and propensity for violence over time, but is prevented from informing the jury of the true meaning of the noncapital sentencing alternative.

The State points out that this Court has held that parole is not a proper consideration for jury deliberation in the punishment phase of capital murder trials, a holding purportedly grounded in principles of separation of powers. *E.g., Jones,* 843 S.W.2d at 495. That is, juror speculation about when the Board of Pardon and Paroles might release a convict on parole would encroach upon a manifestly executive function, in violation of Article II, § 1 of the Texas Constitution. However, as Judge Clinton persuasively argues in his dissenting opinion, informing jurors in a capital case that a defendant sentenced to life imprisonment must serve some minimal length of that sentence before becoming eligible for parole does not implicate principles of separation of powers. *See Smith,* at 845–847 (Clinton, J., dissenting). Indeed, because the Legislature has provided for a minimum period of time which a defendant will serve before becoming parole *eligible,*[15] the Board of Pardon and Paroles does not have "jurisdiction" over the defendant until that time has run.

## IV. Truth in Sentencing

This conclusion is also consistent with the "truth in sentencing" policy of the State of Texas. In its "Recommendations to the 73rd Legislature," the Texas Punishment Standards Commission recommended, based on the notion of "truth in sentencing," that juries be informed of the amount of time offenders will be required to spend in prison. The Commission reasoned:

> The public is fed up with illusory long sentences handed down to offenders and

**15.** Tex.Code Crim.Proc.Ann. art. 42.18 § 8(b); *see supra* note 2.

with the ability of the parole board to circumvent the wishes of judges and juries by setting offenders free long before the scheduled termination of their sentences. The public is entitled to more accurate information about the way our system works, and to a system that is not complicated by elaborate parole and good conduct provisions.... Such a system gives true sentencing authority back to the appropriate and accountable entity, judges and juries, and removes the discretion to decide how long someone will serve from the considerably less accountable parole board. Everyone involved—including the victim, the jury, and the offender—knows exactly how long the offender will serve before the offender is back on the streets. Truth in sentencing is the only way to reestablish the integrity of our criminal justice system in Texas and to restore the public's faith in that system.

Texas Punishment Standards Commission, *Recommendations to the 73rd Legislature* 29 (Dec. 16, 1992). The report did not distinguish between noncapital and capital cases regarding the information that sentencers should have. Although the State now opposes informing juries of the parole laws in capital cases, the Texas District and County Attorneys Association's "Sentencing Policy Statement" outlined a contradictory position:

> TDCAA [Texas District and County Attorneys Association] wholeheartedly agrees that the public deserves, and justice demands, truth in sentencing, which should include:
>
> > -immediately telling the public the actual lengths of sentences now being served by various offenders;
> >
> > -modifying current law to tell the public at the time of sentencing whether, when, and under what circumstances felons' sentences may or will be modified or terminated;
>
> > \* \* \* \* \* \*
>
> -modifying the current law to enable and require courts and prosecutors to tell

victims, juries, and the public the truth about the effect on sentence lengths of concurrent sentencing and back-time credits.

Texas District and County Attorneys Association, "Sentencing Policy Statement," *printed in* Texas Punishment Standards Commission, *Summit Report: A Report of the Proceedings of the Texas Punishment Standard Commission's Criminal Justice Summit* (Aug. 13–15, 1992).

Consistent with the "truth in sentencing" policy, the voters of Texas approved an amendment to Article IV, § 11 of the Texas Constitution in 1989 that authorized the Legislature to enact "laws that require or permit courts to inform juries about the effect of . . . eligibility for parole ... on the period of incarceration served by a defendant convicted of a criminal offense." Acts 1989, 71st Leg., S.J.R. 4, § 1, approved Nov. 7, 1989. The Texas Legislature simultaneously enacted Texas Code of Criminal Procedure article 37.07, § 4, which mandates that the court inform the jury in noncapital felony cases of the applicable good conduct time, actual time defendant will serve, and parole eligibility. Acts 1989, 71st Leg, ch. 103, § 1.

"Truth in sentencing" is no less compelling in capital cases than in noncapital cases. Indeed, because the penalty of death is qualitatively different from other penalties, this difference mandates a greater degree of reliability when a sentence of death is imposed. *See, e.g., Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991; *Eddings,* 455 U.S. at 113–15, 102 S.Ct. at 876–77; *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964–65. Further, the Eighth Amendment prohibits procedures that needlessly undermine the reliability of the capital sentencing process. *E.g., Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

## V. Conclusion

Appellant correctly and forcibly argues the trial court's refusal to allow the jury instruc-

tion regarding the statutory minimum incarceration period effectively prevented the jury from giving mitigating weight to the testimony of Dr. Fason at the punishment stage of the trial. While this Court has held that appellant cannot be prevented from presenting this testimony to the jury, *Matson*, 819 S.W.2d at 850–51, without instruction on the applicable parole eligibility law, appellant's Eighth Amendment rights cannot be fully realized. The testimony of Dr. Fason indicated that time and appellant's environment were important factors in predicting future dangerousness. Absent an instruction on the statutory minimum period of time that appellant would be in a prison environment, the jury could not "give effect" to his testimony.

Due to the likelihood of juror misunderstanding regarding the meaning of "life imprisonment" and "society,"[16] and jurors' inability to "give effect" to relevant mitigating evidence of decreased recidivism and violence over time, the trial court unconstitutionally denied appellant's minimum incarceration period instruction in violation of the Eighth and Fourteenth Amendments. Moreover, this conclusion is consistent with the "truth in sentencing" policy of Texas, which is more compelling in the capital sentencing than in the noncapital sentencing context.

While the plurality carefully analyzes appellant's ninth point of error challenging the trial court's refusal of his minimum incarceration period instruction under the Due Process Clause, *Smith*, at 848–853, it cursorily dismisses his related claim under the Eighth Amendment. *Id.* at 853–854. Because the plurality fails to consider appellant's eleventh point of error in light of *Matson* and established Eighth Amendment death penalty jurisprudence and overrules it, I respectfully dissent.[17]

OVERSTREET, J., joins.

---

**16.** The trial court denied appellant's request to define "society" for the jury, stating that it was a word in "common use in the English language and ... readily understood by the populous [sic]." However, while this Court has defined "society" as including both prison and the free world, *see, e.g., Boyd v. State*, 811 S.W.2d 105, 118 n. 12 (Tex.Crim.App.1991), *cert. denied*, 502 U.S. 971, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991), even attorneys are confused as to its meaning. For example, appellant's counsel asserted:

The Legislature in composing the wording for this [second] issue did not contemplate T.D.C. or Texas Department of Corrections as being a part of society that this jury needs to consider in determining whether or not the defendant will pose a continuing threat to society. The society that is reflected in the issue is in fact that the society that the jurors live in, individuals on the street who are free from incarceration.

**17.** In footnote 25, the plurality states, "The choice of determining what a jury should consider is generally legislative." *Smith*, at 853 n. 25. Where there exists in the law a vacuum and the Constitution mandates the filling of that vacuum in order to properly answer a controversy, this Court should not succumb to the ostrich-like argument that the matter should be taken care of through the legislative process; certainly this argument fails *vis-a-vis* Constitutional matters. The plurality refuses, as it did in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256, to fulfill our constitutional mandate. As explained above, this Court is compelled by *Matson*, 819 S.W.2d 839, argued by appellant but not mentioned by the plurality, and established Eighth Amendment death penalty jurisprudence to hold that the trial court's refusal of appellant's instruction is error.